# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| ACCELERON, LLC, | Civil Action File No.: |
| Plaintiff, | |
| v. | 1:12-cv-04123-TCB |
| DELL INC., | JURY TRIAL DEMANDED |
| Defendant. | |

## DELL'S OPENING CLAIM CONSTRUCTION BRIEF

# **TABLE OF CONTENTS**

I.    APPLICABLE LEGAL PRINCIPLES ...........................................................1

II.   BACKGROUND OF THE '021 PATENT ....................................................3

III.  DELL'S PROPOSED CLAIM CONSTRUCTIONS....................................4

    A.   "power module" ....................................................................................4

        1.   The '021 Patent Touts the Advantages of DC-DC Power Supplies and Disparages AC-DC Power Supplies....................5

        2.   The Use of DC-DC Converters in the Power Module Facilitate a Goal of the Invention................................................7

        3.   Plaintiff's Construction Ignores the Intrinsic Evidence and Improperly Recaptures Disavowed Subject Matter ............7

    B.   "CPU module(s)" ...................................................................................8

        1.   The CPU Module of the "Invention" Lacks a Mass Storage Device ...........................................................................8

        2.   Lack of a Mass Storage Device on the CPU Module is an Important Feature of the Invention ...........................................10

        3.   Plaintiff's Construction is Divorced From the Specification............................................................................11

    C.   "ethernet switch module"....................................................................12

        1.   The Disclosed Ethernet Switch Module Uses Addresses to Direct Network Communications in the Computer Network Appliance .................................................................13

        2.   Plaintiff's Construction is Inconsistent with the Specification and the Extrinsic Evidence ................................14

    D.   "is a stand-alone . . . computer" and "is a . . . independently-functioning computer"........................................................................14

1.    The Phrase "Is A Stand-Alone Independently-Functioning Computer" is not Supported by the Specification................................................................15

2.    The Terms "Stand-Alone" and "Independently-Functioning" Must Have Different Meanings ..........................16

3.    Plaintiff's Constructions Improperly Fail to Give Both Terms Distinct Meanings and Ignore Claim Limitations .........18

E.    "hot-swappable . . . modules" ..........................................19

1.    Hot-Swapping Requires That the Modules be Replaced Without Disrupting the Normal Operation of the Appliance ..............................................................................19

2.    Plaintiff's Construction is Incomplete and Inconsistent With its Previous Construction of "Hot-Swappable" ..............20

F.    "hot swap connector" and "hot swap mating connector ....................22

1.    The Hot Swap Connectors of the Modules Must Have a Specific Pinout ..........................................................................22

2.    The Hot Swap Mating Connector Includes Elements That Correspond With the Pins of the Hot Swap Connector ............24

3.    Plaintiff's Construction of "Hot Swap Connector" is Not Supported by the Specification and Encompasses the Prior Art ..................................................................................24

G.    "caddies" ..........................................................................26

1.    The '021 Patent Requires That a Caddy be Part of the Chassis ..................................................................................26

2.    Plaintiff's Construction Fails to Define the Scope of the Claim and Does not Resolve the Dispute Between the Parties ..................................................................................28

H.    "network attached storage (NAS) / NAS" ..........................................30

1.     The '021 Patent Limits the Meaning of "Network Attached Storage (NAS)" ........................................................31

2.     The Prosecution History Confirms Dell's Construction...........32

I.     "poll(s)" .................................................................................32

1.     Plaintiff Repeatedly Disclaimed a Broad Construction of "Poll(s)" ............................................................................33

2.     Plaintiff's Construction is Incorrect and Overly Broad...........34

J.     "the dedicated ethernet path . . . provides the microcontroller module with a connection to remotely poll the CPU module, the power module and the ethernet switch module"................................35

1.     The Patent Discloses a Single Ethernet Path to Poll All Three Recited Modules ..............................................................36

2.     Plaintiff's Construction is Improper At Least because it Does Not Construe the Disputed Term......................................37

K.     "the microcontroller module performs a remote reset of the CPU module if the OS of the CPU module is determined to be unstable or have crashed"....................................................................38

1.     The Microcontroller Module Determines that the OS of the CPU Module Has Failed or is Likely to Fail ......................38

2.     Plaintiff's Construction is Inconsistent with the Specification and Adds Unnecessary Ambiguity .....................39

L.     "the ground pins have made contact" and "the power pins have made contact"....................................................................................40

1.     The '021 Patent Teaches that the Pins of the Hot Swap Connector Touch the Corresponding Elements of the Hot Swap Mating Connector .............................................................40

2.     Plaintiff's Construction Lacks Supports and Adds Confusion...................................................................................41

M.    The steps of Claim 30 Must Be Performed in the Recited Order .......42

    1.    The Grammar of Claim 30 Require the Steps to be Performed in the Recited Order ................................................43

    2.    The Patent Stresses the Importance of Connecting the Pins to Corresponding Elements in a Specific Order ..............44

N.    The Preamble of Claim 30 is Limiting................................................45

IV.    CONCLUSION..............................................................................................47

# TABLE OF AUTHORITIES

CASES                                                                              Page(s)

*Abtox, Inc. v. Exitron Corp.*,
    122 F.3d 1019 (Fed. Cir. 1997) ..........................................................36

*Acceleron LLC v. Egenera, Inc. et al.*,
    6:08-cv-00417-MHS, Dkt. No. 262 ....................................................21

*Acceleron LLC v. Hewlett-Packard Co. et al.*,
    1:10-cv-00128-SLR, Dkt. No. 461 ..........................................21, 22, 23, 24, 25

*Alloc, Inc. v. Int'l Trade Comm'n*,
    342 F.3d 1361 (Fed. Cir. 2003) ..........................................................23

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003) ..........................................................30

*Aylus Networks, Inc. v. Apple Inc.*,
    856 F.3d 1353 (Fed. Cir. 2017) ....................................................2, 28

*Bates v. Coe*,
    98 U.S. 31 (1878).................................................................................8

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
    713 F.3d 1090 (Fed. Cir. 2013) ..........................................................34

*Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002) ............................................................47

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008) ..........................................................32

*Dell Inc. v. Acceleron, LLC*,
    818 F.3d 1293, No. 15-1513 (Fed. Cir. 2016), Dkt. No. 22 .........................29, 37

*Dell Inc. v. Acceleron, LLC*,
    IPR 2013-00440 (P.T.A.B. filed July 12, 2013)....................4, 5, 6, 7, 28, 29, 34

*Dell Inc. v. Acceleron, LLC*,
    No. 17-1101 (Fed. Cir. Apr. 3, 2017), Dkt. No. 21 ......................................29, 31

*Eaton Corp. v. Rockwell Int'l Corp.*,
    323 F.3d 1332 (Fed. Cir. 2003) ...........................................................................46

*Edwards Lifesciences LLC v. Cook Inc.*,
    582 F.3d 1322 (Fed. Cir. 2009) ....................................................................1, 25

*Embrex, Inc. v. Serv. Eng'g Corp.*,
    216 F.3d 1343 (Fed Cir. 2000) ...........................................................................18

*Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*,
    616 F.3d 1357 (Fed. Cir. 2010) ..........................................................................42

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006) ........................................................................5, 9

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*,
    450 F.3d 1350 (Fed. Cir. 2006) ..................................................................2, 6, 10

*Lyndall Thermal/Acoustical, Inc. v. Fed.-Mogul Corp.*,
    344 F. App'x. 607 (Fed. Cir. 2009) .......................................................................9

*Markman v. Westview Instruments Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ...........................................................................1, 8

*Medrad, Inc. v. MRI Devices Corp.*,
    401 F.3d 1313 (Fed. Cir. 2005) ............................................................................1

*Merck & Co. v. Teva Pharm. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ..........................................................................17

*Mformation Tech., Inc. v. Research in Motion Ltd.*,
    764 F.3d 1392 (Fed. Cir. 2014) ..........................................................................43

*MPHJ Tech. Investments, LLC v. Ricoh Americas Corp.*,
    847 F.3d 1363 (Fed. Cir. 2017) ..........................................................................27

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) ....................................................................28, 30

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006) .......................................................46

*Pacing Tech., LLC v. Garmin Int'l, Inc.*,
    778 F.3d 1021 (Fed. Cir. 2015) .......................................................20

*Parallel Networks, LLC v. Abercrombie & Fitch Co.*,
    704 F.3d 958 (Fed. Cir. 2013) ...........................................................7

*Pfizer, Inc. v. Teva Pharm. USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005) .......................................................31

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................1, 2, 26

*Schumer v. Lab. Comput. Sys.*,
    308 F.3d 1304 (Fed. Cir. 2002) .......................................................31

*Seachange Int'l, Inc. v. C–COR Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005) ...................................................16, 19

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015) .........................................................4

*TALtech Ltd. v. Esquel Apparel, Inc.*,
    279 F. App'x 974 (Fed. Cir. 2008) ...................................................43

*Trs. of Columbia Univ. in New York v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) .......................................................28

*Virnetx, Inc. v. Cisco Systems, Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) .........................................................9

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .........................................................27

*Winans v. Denmead*,
    56 U.S. 330 (1853)...........................................................................8

This case was brought by Plaintiff Acceleron, LLC against Dell Inc. ("Dell"). Plaintiff asserts Claims 3, 14–17, 20, 22–24, and 34–36 from U.S. Patent No. 6,948,021 ("the '021 Patent") against Dell.

## I.    Applicable Legal Principles

The purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). To ascertain the meaning of claims, courts look primarily to the intrinsic evidence, including: the claims, the specification, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314–17 (Fed. Cir. 2005). The intrinsic evidence informs the "ordinary and customary meaning" of claims, which is the meaning to a person of ordinary skill in the art at the time of the invention "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1312–13. Courts therefore "cannot look at the ordinary meaning of the term . . . in a vacuum. Rather [courts] must look at the ordinary meaning in the context of the written description and the prosecution history." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) (alteration in original).

The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315. Claims are limited to what the specification describes as the "invention." *See Edwards Lifesciences LLC v. Cook*

*Inc.*, 582 F.3d 1322, 1329–30 (Fed. Cir. 2009). Claims are also limited by statements in the specification about the purpose or benefit of the claimed invention, including statements distinguishing or disparaging prior art. *Id.* at 1332–33. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent" and "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. The prosecution history includes statements made during pre-issuance prosecution and post-issuance proceedings like *inter partes* reviews (IPRs). *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360–61 (Fed. Cir. 2017).

In addition to intrinsic evidence, courts may consider extrinsic evidence only to the extent it is consistent with the intrinsic evidence. However, extrinsic evidence is generally "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (internal quotations omitted). In particular, dictionaries are less reliable as they "risk[] transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Id.* at 1321. Although expert testimony may be helpful "to educate the court concerning the invention and the knowledge of a persons of skill in the field of the invention," the Federal Circuit has cautioned against undue reliance on experts. *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1357 (Fed. Cir. 2006).

## II.  Background of the '021 Patent

The '021 Patent was filed on November 16, 2001 and issued on September 20, 2005. The '021 Patent describes hot swapping technology that allows components to be replaced without turning off the power to the computer system such that the system remains operational. Ex. 1, '021 Patent at 1:26–31. The patent discloses drawbacks of existing hot swap technology, such as component damage caused by pitting connectors on the components against corresponding connectors on the larger system, electrical noise, and voltage transients. *Id*. at 1:39–52. To solve the problems with existing hot swap technology, the patent teaches that each of the hot-swappable modules includes a hot swap connector with pins (i.e., ground, power, and signal) of different lengths that allow the pins to make connections with the mating connectors of the backplane in a prearranged pattern so as to reduce voltage transients such as brown outs. *Id*. at 2:14–22.

The '021 Patent also discloses that the computer network appliance of the invention has enhanced fault tolerance. *See id*. at 1:13–17. The patent teaches that enhancing fault tolerance includes increasing the mean time between failure (MTBF) of the components in the appliance. *Id*. at 2:29–34; 5:12–16. The patent describes two features of the appliance that provide increased MTBF: the lack of a local hard disk drive (HDD) on the CPU module and the use of DC-DC converters in the power module. *Id*. at 2:29–34; 2:43–51; 5:12–16; 7:32–35.

The '021 Patent was the subject of an IPR at the Patent Trial and Appeal Board ("PTAB"). *See Dell Inc. v. Acceleron, LLC*, IPR 2013-00440 (P.T.A.B. filed July 12, 2013). As a result, the PTAB invalidated Claims 1, 2, 4, 6–13, 18–19, and 30. Ex. 2, *Dell Inc. v. Acceleron, LLC*, IPR 2013-00440, Paper No. 41 at 26 (P.T.A.B. Dec. 22, 2014); Ex. 3, *Dell Inc. v. Acceleron, LLC*, IPR 2013-00440, Paper No. 49 at 13 (P.T.A.B. Aug. 22, 2016).

## III.   Dell's Proposed Claim Constructions

For every disputed claim term but one, Plaintiff contends that the term does not require construction but provides a definition of the "plain and ordinary meaning" of the term. If a term does not require construction, the Court does not need to provide a meaning for the term. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015). Dell will consider Plaintiff's proposed plain and ordinary meanings as proposed constructions throughout this brief.

### A.   "power module"

| Claims[1] | Plaintiff's Proposed Construction[2] | Dell's Proposed Construction |
|---|---|---|
| 1, 2, *20*, *24*, 26, 28-30 | a self-contained electronic component configured to provide power | a module that supplies power only from a DC-DC converter |

---

[1]   Dell has identified all claims in which a term appears. The Asserted Claims are italicized.

[2]   For all terms except "caddies," Plaintiff states that the term "Does not require construction. However, if the Court determines that construction is necessary, this phrase has its plain and ordinary meaning, which is:" and Plaintiff provided a plain and ordinary meaning. For the purposes of this brief, Dell quotes only Plaintiff's proposed plain and ordinary meaning.

Dell's proposed construction is correct because the patent clearly disavows use of AC-DC power supplies. In contrast, Plaintiff's proposed construction ignores the intrinsic evidence, thus allowing *any* type of power supply to be a power module.

### 1. The '021 Patent Touts the Advantages of DC-DC Power Supplies and Disparages AC-DC Power Supplies

The only type of power module disclosed by the '021 Patent uses a DC-DC converter to supply power to other modules in a computer network appliance. As shown in Figure 4, power module 106 comprises dual DC-DC converters 402 that "perform direct conversion of facility DC voltage (48V) to voltages required for normal operation of the modules that make up the computer network appliance." '021 Patent at 6:53–60. Claims 26–29 recite specific features of the disclosed DC-DC converters but no claim is directed to AC-DC power. In fact, the only portion of the specification that discusses AC-DC power does so solely to describe the disadvantages of using AC-DC power modules in the computer network appliance. Specifically, the patent discloses that typical commercial power supplies run on alternating current (AC) power and require power inverters to convert power from direct current (DC) to AC. *Id.* at 7:17–21. The specification further teaches that these power inverters are expensive, inefficient in converting power from DC to AC, and do not scale well if additional power capacity is needed. *Id.* at 7:21–25. This description of AC-DC power supplies having significant disadvantages amounts to a disavowal of the use of AC-DC power supplies. *See Honeywell Int'l,*

*Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1319–20 (Fed. Cir. 2006) (finding the patentee's "repeated derogatory statements concerning [carbon fibers] are the equivalent of disavowal of that subject matter from the scope of the patent's claims").

As a purported solution to the problems with AC-DC power supplies, the '021 Patent teaches the use of DC-DC converters to allow the power module to directly receive DC power without the need for expensive power inverters. '021 Patent at 7:25–32. The patent touts the advantages of the DC-DC converter:

> Another compelling reason to use DC-DC converters in a commercial electronics design is the MTBF of a DC-DC converter is much greater than that of a switched power supply. A DC-DC converter is also more efficient than a power supply in converting the input voltage to the desired operation voltages, which means that the [computer network] appliance will use less power and generate less heat than a power supply.

*Id*. at 7:32–39; *see also id*. at 2:42–51. Because the specification emphasizes the importance of using DC-DC converters to solve the problems of the prior art, the term "power module" should be construed to supply power from a DC-DC converter as found in Dell's construction. *See Inpro II*, 450 F.3d at 1354–57 (limiting claim scope to a particular feature because the specification characterizes it as an important feature and disparages an alternative feature in the prior art).

6

## 2.    The Use of DC-DC Converters in the Power Module Facilitate a Goal of the Invention

The specification further describes the use of DC-DC converters as providing improvements that facilitate a goal of the invention. Specifically, the patent discloses that "[t]his invention generally relates to fault tolerant computer systems and, more specifically, to a system and method for enhancing fault tolerance . . . in computer systems." '021 Patent at 1:14–17. The Background of the Invention further teaches that "there is a need for a system and method of enhancing fault tolerance . . . so as to reduce . . . the downtime of computer systems." *Id.* at 1:53–56. Plaintiff's expert witness, Mr. William Putnam, testified that increasing mean time between failure (MTBF) of components in a system is an example of increasing fault tolerance of the system. Ex. 4, Putnam Dep. at 121:22–122:11. The patent discloses that "the MTBF of a DC-DC converter is much greater than that of a switched power supply." '021 Patent at 7:32–36. Thus, the DC-DC converter's role in facilitating a goal of the "invention" bolsters Dell's construction. *See Parallel Networks, LLC v. Abercrombie & Fitch Co.*, 704 F.3d 958, 967–68 (Fed. Cir. 2013) (construing a term in accordance with a feature of "the present invention" that "facilitates the invention's key goal").

## 3.    Plaintiff's Construction Ignores the Intrinsic Evidence and Improperly Recaptures Disavowed Subject Matter

Plaintiff's construction violates a fundamental principle of claim construction—the "[c]laims ***must*** be read in view of the specification, of which

they are a part." *Markman*, 52 F.3d at 979 (emphasis added) (citing *Winans v. Denmead*, 56 U.S. 330, 338 (1853); *Bates v. Coe*, 98 U.S. 31, 38–39 (1878)). The proposed construction of "a self-contained electronic component configured to provide power" completely ignores the specification by encompassing *any* type of power supply, even those that the patent criticizes. *See supra* Sections III.A.1 & 2. Additionally, Plaintiff's construction of "module" as "a self-contained electronic component" is incorrect for the reasons noted below. *See infra* Section III.B.3. Accordingly, Plaintiff's construction of "power module" should be rejected.

### B. "CPU module(s)"

| Claims | Plaintiff's Proposed Construction | Dell's Proposed Construction |
|---|---|---|
| 1, 2, 7, 13, *14-16*, 20, *22-24*, 25, 30, 32, *34*, 35 | a self-contained electronic component configured to provide computer processing capabilities | a module that has a central processing unit but lacks a mass storage device |

Dell's proposed construction should be adopted because it embodies the patent's description of "the invention." Plaintiff's proposed construction, however, improperly includes *any* component that provides processing capabilities.

### 1. The CPU Module of the "Invention" Lacks a Mass Storage Device

The '021 Patent consistently discloses the CPU module of "the invention" as lacking a mass storage device, such as a hard disk drive (HDD). Specifically, the Summary of the Invention teaches that the CPU module "*of the invention*"

operates "without the need for a local hard disk drive (HDD)." '021 Patent at 2:23–34 (emphasis added). This statement is especially instructive because including a feature in the Summary of the Invention "gives primacy" to that feature. *See Virnetx, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1317–1319 (Fed. Cir. 2014). Additionally, the specification discloses that "[r]emoval of the local HDD ***is a feature of the invention*** that allows hot swapping of the CPU modules without rebooting the system." '021 Patent at 4:60–62 (emphasis added). Claim terms should be limited to what is described as "the invention." *Honeywell*, 452 F.3d at 1318 (construing claim term to be a fuel filter because "[o]n at least four occasions, the written description refers to the fuel filter as 'this invention' or 'the present invention'").

Furthermore, the only embodiment of a CPU module disclosed in the specification lacks a mass storage device. Figure 2 illustrates components of the CPU modules and does not show any type of mass storage device. The accompanying text of Figure 2 further teaches that the remote boot capability of the CPU module "removes the necessity for a local hard disk drive (HDD)." '021 Patent at 4:39–44. When a patent describes the embodiment as the "invention," it is appropriate to limit the claims to the disclosed embodiment. *See Lyndall Thermal/Acoustical, Inc. v. Fed.-Mogul Corp.*, 344 F. App'x. 607, 613 (Fed. Cir. 2009) ("[W]hen a patentee consistently describes one embodiment as 'the present invention,' the public is entitled to take the patentee at his word.") (internal

9

quotations omitted). Thus, the CPU module should be construed as lacking a mass storage device, as reflected in Dell's construction.

### 2.    Lack of a Mass Storage Device on the CPU Module is an Important Feature of the Invention

As described above in Section III.A.2, the patent discloses that a goal of the invention is to enhance fault tolerance ('021 Patent at 1:14–17, 1:53–56) and Plaintiff's expert testified that increasing MTBF enhances fault tolerance (Putnam Dep. at 121:22–122:11). The specification discloses that "[t]he removal of . . . the HDD . . . reduces the complexity of the design and increases the mean time between failure (MTBF) of the hardware." '021 Patent at 5:12–16; *see also id.* at 2:29–34 ("This remote booting ability of the CPU module allows the CPU module to run different types of operating systems without the need for a local hard disk drive (HDD), which increases the mean time between failure (MTBF)."). Thus, the specification identifies the removal of a mass storage device, such as a HDD, as solving the problems of the prior art. When the specification describes the importance of a feature in solving the problems of the prior art, it is proper to limit the invention to the disclosed feature. *See Inpro II*, 450 F.3d at 1354–55 (limiting "host interface" to "a direct parallel bus interface" because the specification emphasized that the parallel connection was a "very important feature" of the invention in solving the problems in the prior art).

The patentees were clearly concerned with increasing the reliability of the computer network appliance, and, as illustrated by the above statements, the

removal of the local HDD from the CPU module facilitated this goal. At the time of the invention, a person of ordinary skill in the art would have recognized that other types of mass storage devices, such as solid state drives (SSDs), had similar reliability profiles as HDDs. Ex. 5, Declaration of William Michalson, Ph.D. in Support of Dell's Opening Claim Construction Brief at ¶ 15 (Oct. 25, 2017) [hereinafter "*Michalson*"]. Thus, a person of ordinary skill in the art would have understood the '021 Patent as teaching that all types of mass storage devices with reliability issues similar to that of HDDs should be excluded from the CPU module. *Id*. Accordingly, the scope of the claimed "CPU module" should be limited to "a module that has a central processing unit but lacks a mass storage device."

### 3.    Plaintiff's Construction is Divorced From the Specification

Plaintiff fails to properly consider the intrinsic record in construing "CPU module." Specifically, Plaintiff's construction encompasses CPU modules with any components when the specification clearly describes that the CPU module of the "invention" lacks a mass storage device (e.g., HDD). '021 Patent at 2:23–34; 4:60–62. Accordingly, Plaintiff's construction is incorrect and the term should be construed as lacking a mass storage device, consistent with Dell's construction.

Plaintiff's construction also unnecessarily defines "module" to be a "a self-contained electronic component." Not only does this phrase ***not*** appear in the specification but it improperly broadens the scope of "module" supported by the

specification. The patent discloses that the CPU module does not have "components defining a direct user interface." *Id.* at 4:25–28. Therefore, the patent describes that "components" (i.e., "self-contained electronic components") can be part of "modules." Plaintiff's construction, however, would improperly allow for components within the disclosed modules to be the module itself. For these reasons, Plaintiff's construction should be rejected.

### C.   "ethernet switch module"

| Claims | Plaintiff's Proposed Construction | Dell's Proposed Construction |
|---|---|---|
| 1, 2, *20, 24*, 30 | a self-contained electronic component[3] configured to route network communications between multiple devices | a module that directs network communications between multiple devices based on the addresses of the communications |

Dell's proposed construction should be adopted because it is consistent with the understanding of a person of ordinary skill in the art in light of the specification. In contrast, Plaintiff's proposed construction is not only inconsistent with the specification but also with its own expert's understanding of the term.

---

[3]   Like its constructions for "power module" and "CPU module," Plaintiff proposes that the term "module" should be construed as "a self-contained electronic component." For the reasons noted in Section III.B,2, this construction should be rejected.

### 1. The Disclosed Ethernet Switch Module Uses Addresses to Direct Network Communications in the Computer Network Appliance

The '021 Patent contains little disclosure regarding the operation of the ethernet switch module. However, the specification does teach that "[t]he ethernet switch module 110 operates as a traffic cop for data communications in the computer network appliance." *Id*. at 6:8–11. A person of ordinary skill in the art would understand that, in order to operate as a traffic cop, the ethernet switch module would have to direct communications and that switches do so based on the addresses of the communications. *Michalson* at ¶¶ 16–18.

The extrinsic evidence confirms that a switch directs communication based on the address of the communication. A dictionary cited by Dell defines a switch as "a device capable of forwarding packets directly to the ports associated with particular network addresses." *See* Ex. 7, *Microsoft Computer Dictionary* 429 (Microsoft Corp., 4th ed., 1999). Additionally, a dictionary cited by the Plaintiff defines an "ethernet switch" as "work[ing] at Layer 2 of the OSI Reference Model." *See* Ex. 8, Harry Newton, *Newton's Telecom Dictionary* 331–32 (CMP Books, 16th ed. 2000) [hereinafter *Newton*]. As explained by Mr. Putnam, Plaintiff's expert, Layer 2 operations use address information to determine the port to which a packet should be directed. *See* Putnam Dep. at 174:25–179:13. Thus, "ethernet switch module" should be construed to require direction of communications based on the address of those communications.

### 2.   Plaintiff's Construction is Inconsistent with the Specification and the Extrinsic Evidence

In contrast to Dell's construction, Plaintiff's construction broadly allows any type of routing, which is inconsistent with the specification. As noted above, the patent describes the switch as a "traffic cop" for data communications. '021 Patent at 6:6–11. A person acting as a "traffic cop" intelligently directs automobile traffic in a certain direction. Thus, in light of the specification a switch must include some type of intelligence, which is not reflected in Plaintiff's construction. Additionally, this construction is inconsistent with the extrinsic evidence and even with Plaintiff's own expert's understanding of the meaning of the term switch. In fact, Mr. Putnam testified, consistent with Dell's construction, that "a plain ethernet switch module [] generally functions more or less by looking at an address and then deciding which network port a particular packet or frame needs to go out on." *Id*. at 174:25–175:12; *see also id*. at 177:12–23 ("A switch is more efficient because it routes things according to the address information."). Accordingly, Plaintiff's construction must be rejected.

### D.   "is a stand-alone . . . computer" and "is a . . . independently-functioning computer"

| Claims | Plaintiff's Proposed Construction | Dell's Proposed Construction |
|--------|-----------------------------------|------------------------------|
| 1, 30 | "is a stand-alone . . . computer": contains the elements sufficient to permit operation as a computer | "is a stand-alone . . . computer": operates as a computer when not connected to a computer network appliance or to any other CPU module |

14

| 1, 30, 32 | "is a . . . independently-functioning computer": | "is a . . . independently-functioning computer": |
|---|---|---|
| | is a computer that does not require assistance to operate in a predetermined manner | only operates without interacting with any other CPU module in the computer network appliance |

Dell's proposed constructions of these terms properly give meaning to both terms while Plaintiff's proposed constructions conflate the meanings in violation of well-known claim construction principles.

### 1. The Phrase "Is A Stand-Alone Independently-Functioning Computer" is not Supported by the Specification

Claim 1 requires a CPU module that "is a stand-alone independently functioning computer."[4] This phrase was added during prosecution of the '021 Patent to overcome a rejection. Ex. 9, Office Action Response at 13 (Oct. 21, 2004). Notably, the specification does not describe, in contrast to operating or functioning as one, what it means to *be* "stand-alone" or "independently-functioning." The only thing the specification describes is that the CPU module "operates as" and "functions as" a stand-alone computer. *See* '021 Patent at 2:23–24 ("The CPU module of the invention operates as a stand alone computer."); 4:34–35 ("Each CPU module functions as a stand alone computer."). Moreover, Claim 13, which is dependent on Claim 1, recites a CPU module that "operates as a stand alone computer." A CPU module that *is* a stand-alone computer must be

---

[4]   Claim 30 reverses the order of these terms, reciting a plurality of CPU modules, each of which "is an independently-functioning stand-alone computer…"

different than a CPU module that **_operates as_** a stand-alone computer because Claim 1 must mean something different from Claim 13. _Seachange Int'l, Inc. v. C–COR Inc._, 413 F.3d 1361, 1368–1369 (Fed. Cir. 2005) (claim differentiation stems from "the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.").

The term "independently-functioning" does not appear in the specification outside of the claims. When this limitation was added during prosecution, the applicant argued that, unlike the cited prior art, "the present invention describes a cluster computer device that interconnects multiple independently-functioning computers, allowing components of the computers to be used as shared resources." Office Action Response at 13 (Oct. 21, 2004). The applicant identified the ethernet switch module and power modules as being the "shared resources." _Id_. To the extent that the intrinsic evidence provides _any_ guidance as to the meaning of this term, Dell's construction of "independently-functioning" is, consistent with the intrinsic evidence.

### 2.     The Terms "Stand-Alone" and "Independently-Functioning" Must Have Different Meanings

Dell proposes separate and distinct constructions for the terms "is a stand-alone … computer" and "is a … independently functioning computer." Dell's construction of "is a stand-alone ... computer" requires the CPU module to operate as a computer when not connected to the computer network appliance or any other

CPU module. In contrast, Dell's construction of "is a ... independently-functioning computer" requires that the CPU modules only operate without interacting with any other CPU module in the computer network appliance. Thus, under Dell's proposed constructions, being a stand-alone computer means something different from being an independently-functioning computer. *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

While the '021 Patent does not describe what these terms mean, dictionaries support Dell's construction of these two terms. One dictionary defines "stand-alone" as "of, pertaining to, or being a device that does not require support from another device or system, for example, a computer that is not connected to a network." Ex. 10, *Microsoft Press Computer Dictionary* 447 (Microsoft Press, 3d ed. 1997) [hereinafter *Microsoft 3d*]. Another dictionary provides 23 definitions for the term "independent," including "not dependent; not depending or contingent upon something else for existence, operation, etc." and "not relying on another or others for aid or support." Ex. 11, *Random House Webster's Unabridged Dictionary* 970–71 (Random House, Inc., 2d ed. 1999). Thus the extrinsic evidence is consistent with Dell's constructions of "is a stand-alone … computer" and "is a … independently functioning computer."

### 3.   Plaintiff's Constructions Improperly Fail to Give Both Terms Distinct Meanings and Ignore Claim Limitations

Plaintiff's proposed constructions for these terms are improper for several reasons. First, the constructions fail to give distinct meanings to both terms. Instead, Plaintiff's constructions are circular and confusing.[5] Plaintiff construes "is a stand-alone ... computer" as "contains the elements sufficient to permit operation as a computer" and "is a ... independently-functioning computer" as "is a computer that does not require assistance to operate in a predetermined manner." Both of these constructions appear to require exactly the same thing, namely that the CPU module includes sufficient elements to operate without assistance. Accordingly, Plaintiff's constructions fail to give each term a distinct meaning and are therefore improper.

Plaintiff also reads out limitations in the claims, namely that the CPU module *is* a stand-alone computer. Instead, Plaintiff's construction treats the CPU module as a device that merely *operates* as a stand-alone computer. For example, Plaintiff's construction would encompass a CPU module that requires other modules of the computer network appliance to operate. In contrast, a CPU module that *is* a stand-alone computer contains the elements to operate outside of the appliance. Further, as explained above, Claim 13 recites a CPU module that

---

[5]   The purpose of claim construction is to help the jury understand the meaning of the claims. *See Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed Cir. 2000).

operates as a stand-alone computer, so Claim 1 cannot mean a device that merely operates as such and must have a different scope. *See Seachange*, 413 F.3d at 1368–1369. Accordingly, Plaintiff's constructions are incorrect and should be rejected.

### E.   "hot-swappable . . . modules"

| Claims | Plaintiff's Proposed Construction | Dell's Proposed Construction |
|---|---|---|
| 1, *20*, *24*, 30 | a self-contained electronic component capable of being added to or removed from the computer network appliance while the computer network appliance is powered on | a module that may be inserted into and/or removed from a computer network appliance without disrupting the normal operation of the network appliance |

Dell's proposed construction is consistent with the specification and should be adopted. In contrast, Plaintiff's proposed construction is incomplete, reads out a key feature of the invention, and conflicts with Plaintiff's prior construction of the term.

### 1.   Hot-Swapping Requires That the Modules be Replaced Without Disrupting the Normal Operation of the Appliance

The concept of "[h]ot swap technology" was not new at the time the '021 Patent was filed. '021 Patent at 1:26–28. The specification describes hot swapping as "enabl[ing] the insertion and/or removal of components in a computer system while it is still active or operational." *Id.* at 1:29–31. The specification further discloses that, for "normal operation" of the computer network appliance, "the chassis ***must*** be equipped with at least one CPU module, the power module and the

19

ethernet module." *Id*. at 3:37–39 (emphasis added). Thus hot swapping allows the modules to be swapped so that the computer network appliance has all of the modules required for the appliance to be active or operational. Dell's construction is consistent with this disclosure and the historic understanding of this term.

The extrinsic evidence further support's Dell's construction. A dictionary cited by the Plaintiff defines "hot swap" as "[t]o pull out a component from a system and plug in a new one while the power is still on ***and the unit is still operating***." Ex. 12, Alan Freedman, *Computer Desktop Encyclopedia* 410 (Computer Language Co. Inc., 2d ed. 1999) [hereinafter *Freedman*] (emphasis added). Additionally, a prior art patent to the '021 Patent describes "hot swapping" as extracting or inserting blades in a system while the system is in operation. Ex. 13, U.S. Patent No. 6,528,904 at 2:5–9. Accordingly, "hot-swappable . . . modules" should be construed such that the normal operation of the computer network appliance is not disrupted when a module is replaced, as reflected in Dell's construction.

### 2.   Plaintiff's Construction is Incomplete and Inconsistent With its Previous Construction of "Hot-Swappable"

Plaintiff's construction is incomplete and would not achieve the purpose of the '021 Patent. *See Pacing Tech., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1025 (Fed. Cir. 2015) (construing claims to encompass the disclosed object of the invention). Plaintiff's construction simply requires that the computer network appliance remain powered on while the module is replaced. Avoiding disruption to

the appliance during hot-swapping is a key feature of the invention disclosed in the '021 Patent. *See* '021 Patent at 1:61–64. This construction fails to address the required operation of the computer network appliance during hot-swapping, much less the requirement of enabling removal or insertion of without disrupting the operation of the appliance. *Michalson* at ¶¶ 19–20. Thus, Plaintiff's construction is inconsistent with the specification and cannot be adopted.

Further, Plaintiff takes a position for this case that is broader than and inconsistent with the position it took in a previous case involving the '021 Patent. In the previous litigation, Plaintiff agreed that "hot-swappable" should be construed as "allowing insertion and/or removal of modules in a computer network appliance ***while the appliance remains active and fully operational***." Ex. 14, *Acceleron LLC v. Egenera, Inc. et al.*, 6:08-cv-00417-MHS, Dkt. No. 262 at 16–17 (emphasis added); Ex. 15, *Acceleron LLC v. Hewlett-Packard Co. et al.*, 1:10-cv-00128-SLR, Dkt. No. 461 at 16. Here, Plaintiff eliminates the requirement that the appliance must remain operational in its construction of "hot-swappable ... module." Plaintiff should not be allowed construe the same term differently in different litigations.

### F.    "hot swap connector" and "hot swap mating connector

| Claims | Plaintiff's Proposed Construction | Dell's Proposed Construction |
|---|---|---|
| 4, 8-12, 18, *20, 24,* 30, 32, 33 | "hot swap connector": a coupling configured for electrical connection with a corresponding hot swap mating connector | "hot swap connector": a connector having ethernet signal pins, dedicated power and ground pins, and an I2C bus for out-of-band monitoring of the health of the hot-swappable modules in the computer network appliance |
| 1, 4, 8-12, 18, *20, 24,* 30, 32, 33 | "hot swap mating connector": a coupling configured for electrical communication with a corresponding hot swap connector | "hot swap mating connector": a connector having elements corresponding to each of the ethernet signal pins, the dedicated power and ground pins, and the I2C bus of the hot swap connector |

Dell's proposed constructions of these terms are consistent with explicit language in the specification limiting their scope. In contrast, Plaintiff's proposed constructions encompass the prior art.

### 1.    The Hot Swap Connectors of the Modules Must Have a Specific Pinout

The '021 Patent is directed to a computer network appliance with power, ethernet switch, and microcontroller modules shared among hot-swappable CPU modules. '021 Patent at Abstract. The patent teaches that the hot swapping capabilities of the modules in the computer network appliance is the very character of the disclosed invention. *Id.* at 1:53–63.

The '021 Patent discloses that each of the modules in the appliance has a hot swap connector. *Id*. at 4:28–33 (CPU module); 6:2–6 (ethernet switch module); 6:54–57 (power module); 7:45–50 (microcontroller module). The specification further discloses that the hot swap connectors of the modules connect to corresponding hot swap mating connectors on the backplane that provide power and data input/output (I/O) connections within the computer network appliance. *See id* at 3:60–65. The patent explicitly teaches that "[t]he pinout of the hot swap connection **is limited to** ethernet signal path pins, dedicated power and ground pins, and an I2C bus for out-of-band monitoring of the health" of each module. *Id*. at 5:29–33 (emphasis added). This pinout enables the functions that each module of the appliance provides to the other modules. The ethernet signal path pins enable data communications between modules via the backplane board. *Id*. at 6:8–18; *see also id.* at 5:26–29. The power and ground pins allow the power module to provide power to the other modules in the appliance. *Id*. at 6:61–63. The I2C bus is used to provide out-of-band monitoring of the health of the modules in the appliance. *Id*. at 7:65–67; *see also id.* at 7:51–55 (describing the microcontroller module connecting via the hot swap connector), 4:63–67. When the specification refers to a limitation as a character of the invention, it is proper to construe the claims in accordance with that limitation. *See Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("[T]his court looks to whether the specification refers to a limitation only as a part of less than all possible

embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment."). Accordingly, the hot swap connector is limited to these pins, as reflected in Dell's construction.

### 2.    The Hot Swap Mating Connector Includes Elements That Correspond With the Pins of the Hot Swap Connector

Each module in the computer network appliance "includes a hot swap connector for connecting with a specific hot swap mating connector of the backplane board." '021 Patent at 1:67–2:3. The mating connectors allow each of the modules to be inserted in the appliance (*Id.* at 3:60–63) and include corresponding elements to each of the pins in the hot swap connector on each module. *Id.* at 2:14–22; *see also id.* 4:8–20. Additionally, the pins of the hot swap connector for each module and the corresponding elements of the hot swap mating connector are designed to make connections in a sequential order. *Id.* at 3:66–4:24. Accordingly, the hot swap mating connector should be construed to include elements that correspond to the pins of a hot swap connector.

### 3.    Plaintiff's Construction of "Hot Swap Connector" is Not Supported by the Specification and Encompasses the Prior Art

The '021 Patent requires the use of a specific hot swap connector to overcome problems in the prior art. Specifically, the Background discloses that existing hot swapping techniques resulted in damage to connectors "caused by

pitting connectors of the components against connectors of the computer system." *Id*. at 1:39–43; *see also id*. at 1:43–52 (describing additional drawbacks of prior art hot swapping technology including voltage transients and electrical noise). Pitting occurs when current flows between a pin and a corresponding element, causing a spark that physically damages the pin and corresponding element. *Michalson* at ¶ 21. The Summary of the Invention describes an improved hot swap connector that "comprises pin connections arranged in a specific pattern." '021 Patent at 2:14–15. The order of connection of pins in the hot swap connector with corresponding elements in the hot swap mating connector "reduce brown outs in the computer network appliance" caused by instantaneous power shorts. *Id*. at 2:15–22, 3:66–4:24. The specific pattern of connection reduces voltage transients and therefore reduces the likelihood that pitting will occur. *Michalson* at ¶ 22. However, Plaintiff's construction of "hot swap connector" as "a coupling configured for electrical connection with a corresponding hot swap mating connector" improperly encompasses any type of connector that provides an electrical connection to a corresponding connector, even those that the patent disparages and excludes from the scope of the claims. *See Edwards*, 582 F.3d at 1332–33 (limiting the scope of the term "graft" as excluding substantially resilient wires when "the inventors disparaged prior art resilient wires in their 'background art' section of the specification"). Thus, Plaintiff's construction should be rejected.

### G. "caddies"

| Claims | Plaintiff's Proposed Construction | Dell's Proposed Construction |
|---|---|---|
| 3 | A "caddy" (singular) is "a carrier for a module[6]." | a "caddy" (singular) is "a structure that supports a component and is not removable from the chassis with the supported component" |

Dell's proposed construction should be adopted because it is consistent with the intrinsic record. In contrast, Plaintiff's proposed construction fails to adequately define the scope of the term because it does not explicitly require additional limitations—or "notions"—advanced by Plaintiff during prosecution.

### 1. The '021 Patent Requires That a Caddy be Part of the Chassis

The language of Claim 3 requires that the caddy be part of the chassis. Claim 2 introduces a chassis by reciting "a chassis providing physical support for a CPU module, the power module, the ethernet switch module and the backplane board." Claim 3 adds that "the chassis comprises caddies providing air flow from the front to the rear of the chassis." The words of the claims themselves should be the starting point for claim construction. *Phillips*, 415 F.3d at 1312 ("the claims themselves provide substantial guidance as to the meaning of particular claim

---

[6]   Plaintiff's proposed constructions of "CPU module," "power module," and "ethernet switch module" construe the term "module" as "a self-contained electronic component." Ironically, Plaintiff does not have trouble using the term "module" without further construction in the only term that it contends needs to be construed.

terms"); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (Courts "look to the words of the claims themselves . . . to define the scope of the patented invention."). Thus, Claim 3 requires that the caddies physically be a part of the chassis.

The specification supports this understanding and further requires that the caddies be "of the chassis." Figure 1 includes reference number 152 that points to a space within the chassis. *See* '021 Patent at 3:32–34 (describing "caddy 152"). The Summary of the Invention merely parrots the language of Claim 3. *Id*. at 2:3–6. The only other description of caddies in the specification teaches that "[e]ach module resides in a caddy 152 *of the chassis* such that when the module is inserted into the chassis the caddy ensures that the hot swap connectors are aligned." *Id*. at 3:32–34 (emphasis added). Contrary to Plaintiff's assertion, the words "of the chassis" have meaning. The provisional application to which the '021 Patent claims priority states that "[e]ach module resides in a caddy such that when a module is inserted into the chassis the caddy ensures that the hot swap connectors are aligned." Ex. 16, U.S. Prov. App. No. 60/248,834 at 1. When the provisional was converted into a utility application, the patentee included the same statement but added that the caddy must be "of the chassis." *See* '021 Patent at 3:32–34. Accordingly, the caddies of Claim 3 must be part of and not removable from the chassis as reflected in Dell's construction. *See MPHJ Tech. Investments, LLC v. Ricoh Americas Corp.*, 847 F.3d 1363, 1369 (Fed. Cir. 2017) ("[A] provisional

27

application can contribute to understanding the claims"); *see also Trs. of Columbia Univ. in New York v. Symantec Corp.*, 811 F.3d 1359, 1365 (Fed. Cir. 2016) (relying on the provisional application for guidance as to claim construction).

### 2. Plaintiff's Construction Fails to Define the Scope of the Claim and Does not Resolve the Dispute Between the Parties

"Caddies" is the only term that Plaintiff explicitly contends requires a construction other than its "plain and ordinary meaning." However adoption of Plaintiff's proposed construction will not resolve the dispute between the parties because the parties do not agree about the scope. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed.") (citation omitted). The construction of "caddy" (singular) as "a carrier for a module" was at issue in the related IPR proceeding (*see Dell Inc. v. Acceleron, LLC*, IPR 2013-00440 (P.T.A.B. filed July 12, 2013)) and is at issue in a current appeal to the Federal Circuit (*see Dell Inc. v. Acceleron, LLC*, IPR 2013-00440, *appeal docketed*, No. 17-1101 (Fed. Cir. Oct 25, 2016)).

Plaintiff first introduced the construction—"a carrier for a module"—in the related IPR.[7] Ex. 19, *Dell Inc. v. Acceleron, LLC*, IPR 2013-00440, Paper No. 23 at

---

[7]   Statements made by a patent owner during an IPR proceeding can be considered during claim construction and relied upon to support a finding of prosecution disclaimer. *Aylus*, 856 F.3d at 1361.

2–3 [hereinafter "*Paper 23*"] at 12. However, rather than applying the language of the construction, Plaintiff added further "notions" that are not evident from the words of the proposed construction.[8] Plaintiff argued that the construction of "'caddies' as 'carriers for modules' includes the notions of transportability (carrying), protection, connectability, and air flow." Ex. 20, Brief of Cross-Appellant Acceleron, LLC at 16, *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, No. 15-1513 (Fed. Cir. 2016), Dkt. No. 22. These "notions" advanced by Plaintiff have been expanded even further to include allegations that a caddy (1) must not permanently affix an object to a chassis (*Paper 23* at 26); (2) carrries the module at all times (Brief of Cross-Appellant Acceleron, LLC at 8, *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, No. 15-1513 (Fed. Cir. 2016), Dkt. No. 22); (3) must be affixed to the module (*Id.* at 18); and (4) protects a module by minimizing damages and aligning hot-swap connectors (Ex. 23, Brief of Appellee Acceleron, LLC at 6, *Dell Inc. v. Acceleron, LLC*, No. 17-1101 (Fed. Cir. Apr. 3, 2017), Dkt. No. 21). Yet none of these "notions" appear in Plaintiff's proposed construction. It would be improper to construe the term "caddy" as simply "a carrier for a module" in this

---

[8] Dell agreed to the construction as "carrier for a module" at the IPR hearing, but disagreed with the additional limitations Plaintiff argues are somehow part of or implied in said construction. *See* Ex. 17, *Dell Inc. v. Acceleron, LLC*, IPR 2013-00440, Paper No. 40 at 17 (P.T.A.B. Sept. 4, 2014) [hereinafter "*Paper 40*"]; Brief of Cross-Appellant Acceleron, LLC at 8, *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, No. 15-1513 (Fed. Cir. 2016), Dkt. No. 22; Ex. 18, *Dell Inc. v. Acceleron, LLC*, IPR 2013-00440, Paper No. 47 at 2 n.1 (P.T.A.B. June 8, 2016).

litigation because this effectively permits Plaintiff to include additional limitations to avoid invalidity before the PTAB and then remove such limitations to prove infringement before this Court. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003) ("It is axiomatic that claims are construed the same way for both invalidity and infringement."). Adoption of Plaintiff's construction will simply delay the dispute between the Parties as to what does or does not qualify as a "caddy."[9] Dell's construction, in contrast, clarifies the scope of the claim such that the Court will not have to re-construe the claim.

### H.   "network attached storage (NAS) / NAS"

| Claims | Plaintiff's Proposed Construction | Dell's Proposed Construction |
|---|---|---|
| 14, 15, 34 | a platform-independent storage appliance for connection to a network | a storage device external to the computer network appliance that recognizes and processes file-level data |

The parties dispute whether "network attached storage (NAS)" refers to a specific type of storage device (as Dell proposes and as supported by the intrinsic record), or refers to any type of storage connected to a network (as Plaintiff contends).

---

[9] This is not permitted under *O2 Micro.*, 521 F.3d 1351, 1360.

### 1. The '021 Patent Limits the Meaning of "Network Attached Storage (NAS)"

The patent uses the phrase "network attached storage" only twice—once in Claim 14 and once in the detailed description. '021 Patent at 2:26, Claim 14. All other references, including the claims, use the acronym "NAS." *See e.g.*, *id.* at 2:27–29; 4:36–50; 6:47–52; 8:31–38; 8:53–67; Claims 14, 15, 34. This acronym has a special meaning to a person of ordinary skill in the art. *Michalson* at ¶ 23. Specifically, a NAS is a type of storage device connected to a network, which processes data at a file-level. *Id.* at ¶¶ 24–25; *see also Freedman* at 603.

The '021 Patent also discloses that a storage area network ("SAN") is used to store information. '021 Patent at 4:36–50. NAS and SAN are different types of storage accessible over a network. *Michalson* at ¶ 24–25. Despite this disclosure, no claims are directed to a SAN. Rather, Claims 14, 15, and 34 only recite a NAS. When, as here, subject matter is disclosed but not claimed, it is dedicated the public if identified as an alternative to the claimed limitation. *Pfizer, Inc. v. Teva Pharm. USA, Inc.*, 429 F.3d 1364, 1379 (Fed. Cir. 2005). The '021 Patent teaches that data is "stored in an NAS *or* a . . . SAN." *See* '021 Patent at 4:45–48 (emphasis added). The word "or" is consistently interpreted to mean that items are alternatives to each other. *See Schumer v. Lab. Comput. Sys.*, 308 F.3d 1304, 1311 (Fed. Cir. 2002). Thus, the '021 Patent dedicates other types of storage accessible over a network—specifically SAN—to the public.

## 2. The Prosecution History Confirms Dell's Construction

The prosecution history further confirms that the claims are limited to a specific type of storage device. During the IPR, Plaintiff argued that the cited prior art failed to disclose a boot image stored on a NAS. *Paper 23* at 36. Specifically, Plaintiff argued that the prior art *Hipp* patent could not anticipate Claim 14 because it disclosed multiple storage devices connected to a server over a network—only one of which was identified as a NAS—and the boot image could be stored on any of the disclosed storage devices. *Id.* at 36–37. The statements by Plaintiff in the IPR make clear that, to preserve the validity of the claims, "NAS" is a specific type of storage accessible over a network, not simply any storage that is connected to a network. Thus, Plaintiff disclaimed any storage device other than a "network attached storage" or "NAS" and Plaintiff's broad construction of any storage device for connection to a network should be rejected. *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (characterizing the invention in a way that overcomes rejections based on prior art limits the scope of a claim).

## I. "poll(s)"

| Claims | Plaintiff's Proposed Construction | Dell's Proposed Construction |
|--------|-----------------------------------|------------------------------|
| *20, 22* | actively gather(s) information | send(s) routine, periodic requests for health or status information to other modules in the system |

Dell's proposed construction is consistent with the understanding of a person of ordinary skill in the art in view of the intrinsic evidence and should be adopted. In contrast, Plaintiff's proposed construction captures any method of gathering information even those Plaintiff has admitted are not polling.

### 1.   Plaintiff Repeatedly Disclaimed a Broad Construction of "Poll(s)"

The '021 Patent clearly discloses gathering health and status information for the modules in the computer network appliance using active polling rather than passive interrupts. The specification discloses that "[t]he microcontroller uses a dedicated ethernet path separate from the network data I/O to remotely poll the health" of the modules. '021 Patent at 7:62–65. The specification also teaches that "[t]he microcontroller module communicates with other modules using an I2C bus that gathers status information, logs the results and provides the log to the management software either actively (should a failure [be] detected) or as part of a routine poll." *Id*. at 7:65–8:2. Thus, as described in the '021 Patent, polling requires that the microcontroller module routinely interrogate the other modules in search of health or status information, rather than receive information when an event occurs.

To the extent that the specification can be read to encompass any passive method for gathering health information from the modules in the computer network appliance, Plaintiff disclaimed this scope during the IPR for the '021 Patent. In attempting to distinguish the prior art *Hipp* patent during the IPR,

33

Plaintiff repeatedly distinguished polling from interrupts. Specifically, Plaintiff argued that "'interrupts,' which is where 'the module itself forces the information to be sent to the receiving module' could be used *instead* of polling in *Hipp*." *Paper 23* at 45 (emphasis added). In fact, Plaintiff asserted that "interrupts [are] a *completely different approach* than polling." Ex. 21, *Dell Inc. v. Acceleron, LLC*, IPR 2013-00440, Paper No. 48 at 9 (P.T.A.B. June 8, 2016) [hereinafter "*Paper 48*"] (emphasis added). Plaintiff further argued that a system that "transfers or pushes … data" is not "polling at all" (*Paper 40* at 71–73) and that the microcontroller must "gather information, which requires active interrogation of a module" (*Paper 48* at 10). These statements by Plaintiff during the IPR clearly disclaim the use of interrupts by the microcontroller module to [gather] the required information. *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) ("[W]hen the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered.").

## 2.    Plaintiff's Construction is Incorrect and Overly Broad

Plaintiff's proposed construction is incorrect for a number of reasons. As described above, Plaintiff's proposal is incorrect because it ignores the numerous statements made by the Plaintiff during the IPR limiting "poll[ing]" to a specific type of gathering information and distinguishing other types of gathering

information—namely interrupts. *See supra* Section III.I.1. Further, Plaintiff's construction fails to indicate that polling is periodic and routine rather than event driven like an interrupt. *Michalson* at ¶¶ 26–28. Finally, Plaintiff's proposal of "actively gather(s)" does not convey that the microcontroller module must interrogate the other modules, affirmatively seeking health or status information. For at least these reasons, Plaintiff's proposed construction should not be adopted.

### J.   "the dedicated ethernet path . . . provides the microcontroller module with a connection to remotely poll the CPU module, the power module and the ethernet switch module"

| Claims | Plaintiff's Proposed Construction | Dell's Proposed Construction |
| --- | --- | --- |
| *20* | Does not require construction. However, if the Court determines that construction is necessary, this phrase has its plain and ordinary meaning, which includes the microcontroller module [is] configured for remote polling via the dedicated ethernet path | a single communication path connecting the microcontroller module to all of the CPU module, power module, and ethernet switch module |

Dell's proposed construction should be adopted because it is consistent with the claim language and the specification. In addition to being inconsistent with the intrinsic record, Plaintiff's proposed construction also fails to construe the term "the dedicated ethernet path."

35

### 1.   The Patent Discloses a Single Ethernet Path to Poll All Three Recited Modules

The plain language of Claim 20 requires that the dedicated ethernet path is used to poll all three modules: the CPU module, the power module, and the ethernet switch module. The language of Claim 20 requires that "the dedicated ethernet path . . . provides the microcontroller module with *a connection* to remotely poll the CPU module, the power module *and* the ethernet switch module." *Id*. at Claim 20 (emphasis added). Thus, a single connection ("a connection") is required for polling all three of the identified modules ("the CPU module, the power module, and the ethernet switch module"). *See Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023–24 (Fed. Cir. 1997) (limiting "a metallic gas-confining chamber" to a single chamber because the "[n]othing in the written description suggests that the claim language encompasses a device with more than one gas-confining chamber"). Dell's proposed construction is correct because it incorporates this requirement.

The specification only describes a single path that is dedicated to polling the CPU modules, the power module and the ethernet switch module. Specifically, the "dedicated ethernet path" is simply the connection, or conduit, by which polling occurs. The specification identifies the I2C bus as the "dedicated ethernet path" that is used to gather information. '021 Patent at 7:65–8:2. Thus, a person of ordinary skill in the art would understand that a single I2C bus polls all other

36

modules—the CPU, power, and ethernet switch—in the computer network appliance. *Michalson* at ¶¶ 29–30.

### 2. Plaintiff's Construction is Improper At Least because it Does Not Construe the Disputed Term

Plaintiff's proposed construction completely misses the mark. Instead of proposing a construction of "the dedicated ethernet path," Plaintiff adopts the Federal Circuit's construction of the claimed "microcontroller module," *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1299–1300 (Fed. Cir. 2016) (determining that "the microcontroller module actually be configured for remote polling"), but in doing so ignores that Plaintiff cannot rely on the Federal Circuit's consideration of this claim term because the Court was not construing the "dedicated ethernet path." Rather, the Court was determining whether the microcontroller module of Claim 20 had to be programmed to poll. *Id.* at 1300. Thus, Plaintiff's proposed construction incorrectly focuses on what the microcontroller module does and ignores the "dedicated ethernet path" entirely. Accordingly, Plaintiff's construction incorrect and should not be adopted.

**K.** **"the microcontroller module performs a remote reset of the CPU module if the OS of the CPU module is determined to be unstable or have crashed"**

| Claims | Plaintiff's Proposed Construction | Dell's Proposed Construction |
|---|---|---|
| *23* | the microcontroller module is configured to communicate a control signal to a CPU module upon a determination that an operating system of the CPU module is likely to fail or has failed to operate in a predetermined manner, resulting in the CPU module restarting | the microcontroller communicates a control signal to a CPU module upon the microcontroller module determining that an operating system of the CPU module is likely to fail or has failed |

Dell's proposed construction should be adopted because it is consistent with the specification. Plaintiff's construction, in contrast, ignores the specification and introduces confusion and ambiguity.

**1.** **The Microcontroller Module Determines that the OS of the CPU Module Has Failed or is Likely to Fail**

Dell's proposed construction properly conveys that the microcontroller module determines that an operating system is likely to fail or has failed. The '021 Patent describes that "[o]nce the OS is loaded on the CPU module and is operational, the health of the CPU module can be monitored using an I2C bus 214 that provides status information about the CPU module to the optional microcontroller module 108." *Id.* at 4:63–66. The microcontroller is the only module with the ability to determine if the OS of the CPU module has failed or is likely to fail. *Id.* at 5:1–3 (the microcontroller module includes "a watchdog timer

. . . to provide a way of determining if the OS is unstable or has crashed"). The specification thus discloses that the watchdog timer is the mechanism by which the microcontroller module determines that the OS is unstable or has crashed. Dell's construction is consistent with this disclosure, reciting "the microcontroller communicates a control signal to a CPU module upon *the microcontroller module determining* that an operating system of the CPU module is likely to fail or has failed."

### 2. Plaintiff's Construction is Inconsistent with the Specification and Adds Unnecessary Ambiguity

Plaintiff's construction fails to identify which component determines that the OS of the CPU module is likely to fail or has failed. The specification clearly identifies the microcontroller module as the only component performing this step. *See id*. at 4:63–5:8. Plaintiff's construction is therefore inconsistent with the specification of the '021 Patent.

Furthermore, Plaintiff's construction introduces ambiguity that does not help define the scope of the claim. Plaintiff's proposed construction includes reference to a CPU module that "has failed to operate in a predetermined manner." This is not a term known in the art, the patent does not describe the "predetermined manner" in which the CPU module operates, nor would it be clear to a person of ordinary skill in the art what qualifies as "a predetermined manner." Accordingly, Plaintiff's construction is confusing and therefore should not be adopted.

**L.**   **"the ground pins have made contact" and "the power pins have made contact"**

| Claims | Plaintiff's Proposed Construction | Dell's Proposed Construction |
|---|---|---|
| 10, 30 | "the ground pins have made contact": the ground pins have established electrical connection | "the ground pins have made contact": the ground pins of the connector touch the corresponding ground elements of the mating connector |
| 12, 30 | "the power pins have made contact": the power pins have established electrical connection | "the power pins have made contact": the power pins of the connector touch the corresponding power elements of the mating connector |

The parties dispute whether these terms require that the pins make physical contact (as Dell proposes) or whether electrical connection is sufficient (as Plaintiff contends).

**1.**   **The '021 Patent Teaches that the Pins of the Hot Swap Connector Touch the Corresponding Elements of the Hot Swap Mating Connector**

The specification discloses that pins of the hot swap connectors on the disclosed modules "include ground pins, power pins, and signal pins. *Id*. at 2:14–15; Figs. 2, 3, 4, and 5 (illustrating that the hot swap connectors comprise power and ground pins); *see also id.* at 5:39–34. Additionally, the specification teaches that the pins of the hot swap connector physically connect to corresponding elements in a hot swap mating connector. *Id*. at 2:16–22 ("The ground pins of a hot swap connector are connected first to corresponding ground elements of a hot swap

40

mating connector, and the signal pins of the hot swap connector are connected last to corresponding signal elements of the hot swap mating connector.").

The patent's description of the pin length indicates that the pins must physically touch corresponding elements of the corresponding hot swap mating connector in order to make a connection. Each hot swap connector "comprises groups of pins (ground pins, pre-charge power pins, power pins, and signal pins) of different length that allow the pins to make connections in a prearranged pattern." *Id*. at 4:4–8. The specification describes that the first pins to make contact with corresponding elements in a mating connector on the passive backplane board are the ground pins. *Id*. at 4:7–11. After the pre-charge pins make contact, the power pins make contact with corresponding elements in the mating connector. *Id*. at 4:11–20. This order of contact, made possible by the particular lengths of the pins, permits the system to "[avoid] brown outs, arcing across pins and false ground that can damage components in the computer network appliance." *Id*. at 4:20–24. A person of ordinary skill in the art would understand that the specification is describing that the pins and the corresponding elements are touching because the problems that the patent seeks to avoid are caused by physical contact between pins and corresponding elements. *Michalson* at ¶¶ 21–22.

## 2. Plaintiff's Construction Lacks Supports and Adds Confusion

Plaintiff's proposed constructions are not supported by the specification and will not clarify the terms for a jury. Specifically, it is not clear what it means to

"establish[] electrical connection." Moreover, the specification is clear that the ground and power pins make contact by physically touching the corresponding element of the mating connector, as opposed to some other means of making non-physical contact. *See supra* Section III.F.3. Because Plaintiff's constructions do not clarify the term, Plaintiff's constructions are improper. *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("The criterion [for claim construction] is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention."). Therefore, Plaintiff's constructions should be rejected.

### M.  The steps of Claim 30 Must Be Performed in the Recited Order

| Claims | Plaintiff's Proposed Construction | Dell's Proposed Construction |
|---|---|---|
| 30 | To date, Dell has not identified any specific term, terms or claim phrases for this issue for which Dell contends requires construction by the Court. Therefore, at least at this time, Acceleron is unable respond to Dell's position and reserves the right to supplement its response for this issue if and when appropriate. Acceleron also reserves the right to move the Court to exclude this issue from consideration by the Special Master to the extent that Dell fails to identify a term, a group of terms, or a claim phrase for construction. Notwithstanding the above, Acceleron contends that all terms in claim 30 not otherwise specifically identified for construction retain their plain and ordinary meaning. | Method steps in claim are limited to the order in which they are recited. |

The parties dispute whether the steps of the method recited in Claim 30 must be performed in the order recited. The law requires the steps of a claim be limited to the recited order when the logic and grammar of the claim dictate performance in the recited order and the specification emphasizes the importance of that order. *See TALtech Ltd. v. Esquel Apparel, Inc.*, 279 F. App'x 974, 978 (Fed. Cir. 2008); *Mformation Tech., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1400 (Fed. Cir. 2014)

### 1. The Grammar of Claim 30 Require the Steps to be Performed in the Recited Order

Claim 30 recites specific method steps that rely on the completion of previously recited steps. Claim 30 is reproduced below with each method step annotated with letters [a]–[c] in brackets:

> 30. A method of mounting a plurality of hot-swappable CPU modules in a computer network appliance, wherein each CPU module is an independently-functioning stand-alone computer, each CPU module comprising a hot swap connector including ground pins, power pins and signal pins, the computer network appliance including a backplane board having hot swap mating connectors, the method comprising:
>
> [a] connecting the ground pins of the hot swap connector with corresponding ground elements of a hot swap mating connector of the backplane board;
>
> [b] connecting the power pins of the hot swap connector with corresponding power elements of the hot swap mating connector of the backplane board ***after the ground pins have made contact***; and

[c] connecting the signal pins of the hot swap connector of the module with corresponding signal elements of the hot swap mating connector of the backplane board ***after the power pins have made contact***;

wherein a backplane board interconnects each of the CPU modules with the ground elements, power elements, and signal elements, such that the power module and the ethernet switch module can be used as a shared resource by the plurality of CPU modules.

'021 Patent at Claim 30 (emphasis added). The second connecting step [b] must follow completion of the first connecting step [a] because it requires connecting the power pins "***after the ground pins have made contact***" in step [a]. *Id.* (emphasis added). Similarly, the third connecting step [c] must follow completion of the first connecting step [b] because it requires connecting the power pins "***after the power pins have made contact***" in step [b]. *Id.* (emphasis added). Therefore, the logic and grammar of Claim 30 require the steps of the method to be performed in the order recited.

### 2.     The Patent Stresses the Importance of Connecting the Pins to Corresponding Elements in a Specific Order

The specification is consistent with and even underscores the importance of the order in which the pins of the hot swap connector are connected to corresponding elements of the hot swap mating connector. The specification discloses that "[t]he first group of pins to make contact with corresponding elements in a mating connector on the passive backplane board is the ground pins." '021 Patent at 4:8–11. After the pre-charge pins, "[t]he next group of pins to make contact with corresponding elements in the mating connector is the power pins."

44

*Id.* at 4:12–18. The specification stresses that connecting the pins in the specified order avoids problems in prior art connectors, including brown outs. *Id.* at 4:20–24. Because the order in which the pins make contact with corresponding elements is an important feature of the invention that overcomes the drawbacks that existed in prior art connectors, the steps of Claim 30 must be performed in the order recited.

### N.   The Preamble of Claim 30 is Limiting

| Claims | Plaintiff's Proposed Construction | Dell's Proposed Construction |
|--------|-----------------------------------|------------------------------|
| 30 | To date, Dell has not identified any specific term, terms or claim phrases in the preamble for which Dell contends is a limitation on claim 30. Therefore, at least at this time, Acceleron is unable respond to Dell's position with respect to any one or more parts of the preamble allegedly constituting a limitation on claim 30 and otherwise contends that the entire preamble of claim 30 is not a limitation of the claim. Acceleron reserves the right to supplement its response for this issue if and when appropriate. Acceleron also reserves the right to move the Court to exclude this issue from consideration by the Special Master to the extent that Dell fails to identify a term, a group of terms, or a claim phrase from the preamble for construction. | The preamble is a limitation. |

The parties dispute that the preamble of Claim 30 is limiting. The law is clear that the preamble constitutes a limitation "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003). Multiple terms recited in the body of Claim 30 rely upon the preamble for their antecedent basis. Specifically, the terms "ground pins," "hot swap connector," "power pins." "backplane board," "signal pins," "CPU modules," "power module," and "ethernet switch module" all rely on the preamble for antecedent basis. '021 Patent at 11:19–35. Therefore, without the preamble, none of these terms would have antecedent basis and Claim 30 would be indefinite. The preamble is a necessary component of Claim 30 and thus should be construed as a limitation.

Additionally, a preamble is limiting if it recites a necessary and defining aspect of the invention. *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006). The preamble of Claim 30 recites hot swap connectors including ground, power, and signal pins. '021 Patent at 11:11–18. The body of Claim 30 recites limitations directed to the order in which pins of a hot swap connector are connected to corresponding elements of a hot swap mating connector. *Id*. at 11:19–30. The preamble is necessary to provide context that the recited pins are on a hot swap connector of a CPU module. Without the preamble, a person of ordinary skill in the art would not understand that that the pins are part of a connector of a CPU module as opposed to a connector on a different module.

To exclude that feature would be to exclude an important feature of the invention and thus the preamble is a limitation of Claim 30. *See Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("[W]hen reciting additional structure or steps underscored as important by the specification, the preamble may operate as a claim limitation.").

## IV.    Conclusion

For the foregoing reasons, Dell respectfully requests that the Court adopt Dell's proposed claim constructions for each of the disputed claim terms.

Dated: October 25, 2017

Respectfully submitted,

*/s/ Paula D. Heyman*

Paula D. Heyman

Scott E. Taylor
(Georgia Bar No. 785596)
Andrew B. Flake
(Georgia Bar No. 262425)
Anuj Desai
(Georgia Bar No. 193889)
**ARNALL GOLDEN GREGORY LLP**
171 17th Street Northwest
Suite 2100
Atlanta, Georgia 30363
Telephone: (404) 873-8728
Facsimile: (404) 873-8729
Email: scott.taylor@agg.com
andrew.flake@agg.com
anuj.desai@agg.com

*Of Counsel:*

**BAKER BOTTS L.L.P.**

Kevin J. Meek (admitted *pro hac vice*)
Paula D. Heyman (admitted *pro hac vice*)
Nick Schuneman (admitted *pro hac vice*)
Jennifer L. Nall (admitted *pro hac vice*)
Valerie K. Barker(admitted *pro hac vice*)
Bailey P. Morgan (admitted *pro hac vice*)
Ryan Clark *(admitted pro hac vice)*
98 San Jacinto Boulevard, Suite 1500
Austin, Texas 78701-4078
Telephone: (512) 322-2500
Facsimile: (512) 322-2501
E-mail: kevin.meek@bakerbotts.com
paula.heyman@bakerbotts.com

48

nick.schuneman@bakerbotts.com
jennifer.nall@bakerbotts.com
valerie.barker@bakerbotts.com
bailey.morgan@bakerbotts.com
ryan.clark@bakerbotts.com

**BAKER BOTTS L.L.P.**

Roger Fulghum (admitted *pro hac vice*)
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002-4995
Telephone: (713) 229-1234
Facsimile:  (713) 229-1522
E-mail:  roger.fulghum@bakerbotts.com

***ATTORNEYS FOR DEFENDANT/***
***COUNTERCLAIMANT, DELL INC.***

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1</u>

The undersigned counsel hereby certifies that the foregoing **DELL'S OPENING CLAIM CONSTRUCTION BRIEF** was prepared using 14-point Times New Roman font and a top margin of 1½ inches in accordance with Northern District of Georgia Local Rule 5.1 (C) and (D).

Dated: October 25, 2017.

*/s/ Paula D. Heyman*
Paula D. Heyman

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day the foregoing   **DELL'S OPENING CLAIM CONSTRUCTION BRIEF** was served on all counsel of record by causing a copy of the same to be filed electronically through the Court's ECF system which will automatically send email notification of such filings to all registered counsel as follows:

N. Andrew Crain
Dan R. Gresham
Eric Maurer
Robert Duncan Gravois
**THOMAS |HORSTEMEYER, LLP**
400 Interstate North Parkway
Suite 1500
Atlanta, Georgia 30339
Tel:  (770) 933-9500
Fax: (770) 951-0933
andrew.crain@thomashorstemeyer.com

50

dan.gresham@thomashorstemeyer.com
eric.maurer@thomashorstemeyer.com
robert.gravois@thomashorstemeyer.com

*/s/ Paula D. Heyman*

Paula D. Heyman