**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| ACCELERON, LLC, | Civil Action File No. |
| Plaintiff, | 1:12-CV-04123-TCB |
| v. | |
| DELL, INC., | |
| Defendant. | |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF FINDING OF NO INVALIDITY
ON DELL'S ANTICIPATION AND OBVIOUSNESS
<u>INVALIDITY GROUNDS INVOLVING KETRIS AND RLX</u>**

# TABLE OF CONTENTS

1.  BACKGROUND ........................................................................ 1

1.1.  The '021 Patent Solved a Big Problem in Computer Systems and Has a Priority date of November 16, 2000 .......................................... 1

1.2.  Dell Cannot Show by Clear and Convincing Evidence That the Ketris 9000 Shown at a May 2000 Trade Show had a "hot-swappable ethernet switch module" ..................................................... 3

1.2.1.  As Initially Developed by Ziatech, the Ketris 9000 Had No Ethernet Switch Module ........................................................... 3

1.2.2.  The Only Evidence that a Board Was Modified to Provide an Operable Ethernet Switch for the Ketris 9000 Shown at the N+I Trade Show is the Inventor's Uncorroborated Testimony ............................................................................. 6

1.2.2.1.  No Modified Ethernet Switch Boards Still Exist Today .... 6

1.2.2.2.  No Contemporaneous Corroborating Documents Exist Depicting or Describing the Modified Ethernet Switches ......................................................................... 6

1.2.2.3.  The Actual Ketris 9000 Unit(s) Allegedly Shown at the N+I Show Are Not Known to Still Exist Today ............... 7

1.3.  No Clear and Convincing Evidence that the Ketris 9000 Unit Shown at the N+I Show or Demonstrated Thereafter in 2000 Had Software Configured to Poll the Late-Developed Ethernet Switch ..... 8

1.4.  Dell Cannot Show by Clear and Convincing Evidence That Any Ketris 9000 Shown to Potential Customers Between May and August 2000 was Not Subject to a Non-Disclosure Agreement ........ 10

1.5.  No Corroborating Evidence Establishes RLX's Orbiter Prototype Was Ever Reduced to Practice, Publicly Shown, or Offered for Sale ........................................................................................ 11

ii

2.      APPLICABLE LEGAL STANDARDS ...................................................... 12

    2.1.    Summary Judgment of No Invalidity ................................................ 12

    2.2.    Prior Art and the Requirement for Corroboration ............................. 13

3.      ARGUMENT REGARDING "KETRIS" ................................................... 14

    3.1.    Dell Cannot Establish by Clear and Convincing Evidence that the
           Ketris 9000 is Prior Art to the '021 Patent as a Matter of Law ......... 14

        3.1.1. Dell's § 102(b) Contention Fails Because the N+I Show Was
               Less Than One Year Before the '021 Patent's Priority Date .. 15

        3.1.2. Uncorroborated Oral Testimony on the Modified Ethernet
               Switches Disqualifies the Ketris 9000 as § 102(a) or (g)(2)
               Prior Art for Lack of a "Hot-Swappable Ethernet Switch
               Module" ................................................................................... 15

           3.1.2.1. The Actual Modified Ethernet Switches Do Not Exist.... 15

           3.1.2.2. No Corroborating Documents Describing or Depicting
                  the Actual Modified Ethernet Switches Exist ................. 16

           3.1.2.3. No Witnesses Corroborate Mr. Bottom's Oral
                  Testimony ...................................................................... 17

           3.1.2.4. Mr. Bottom's Uncorroborated Oral Testimony Alone is
                  Insufficient to Constitute Clear and Convincing
                  Evidence to Support § 102(a) or § 102(g) and, Thus
                  § 103 .............................................................................. 20

        3.1.3. Because There is No Clear and Convincing Evidence that
               Polling the Ethernet Switch was Ever Added Before 2001,
               Ketris 9000 is Not Prior Art to Claims 20 and 22 of the '021
               Patent ..................................................................................... 21

        3.1.4. Evidence of NDAs Precludes any Ketris 9000 Unit Allegedly
               Shown by Mr. Forbes During the Summer 2000 From
               Constituting Prior Art Under § 102 or § 103 ......................... 22

4.    ARGUMENT REGARDING "RLX" .......................................................... 23

    4.1.   Dell Cannot as a Matter of Law Establish by Clear and Convincing
           Evidence that the Orbiter Prototype or any device under its "RLX"
           Label is Prior Art to the '021 Patent under §§ 102(a), (b), or (g) ...... 23

5.    CONCLUSION ................................................................................... 25

# TABLE OF AUTHORITIES

CASES

*AdvanceMe v. RapidPay*, 509 F. Supp. 2d 593 (E.D. Tex. 2007) ...........................23

*Barbed Wire Patent Case*, 143 U.S. 275 (1892)......................................................20

*Celotex. v. Catrett*, 477 U.S. 317 (1986) ................................................................12

*Clark v. Coats*, 929 F.2d 604 (11th Cir. 1991)........................................................12

*Eli Lilly & Co. v. Barr Labs.,* 251 F.3d 955 (Fed. Cir. 2001) .................................13

*Finnigan Corp. v. United States ITC,* 180 F.3d 1354 (Fed. Cir. 1999)............ 13, 14

*Hahn v. Wong*, 892 F.2d 1028 (Fed. Cir. 1989) .......................................................13

*In re Reuter,* 670 F.2d 1015 (CCPA 1981)...............................................................18

*Martek Biosciences v. Nutrinova, Inc.,* 579 F.3d 1363 (Fed. Cir. 2009)................13

*Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91 (2011) ...........................................12

*P&G v. Teva Pharm.*, 566 F.3d 989 (Fed. Cir. 2009) ..............................................13

*Price v. Symsek*, 988 F.2d 1187 (Fed. Cir. 1993) ....................................................13

*Quest Integrity USA v. Cokebusters,* 924 F.3d 1220 (Fed. Cir. 2019) ...................15

*Sandt Tech. v. Resco Metal*, 264 F.3d 1344 (Fed. Cir. 2001).................... 13, 20, 25

*Woodland Trust v. Flowertree Nursery*, 148 F.3d 1368 (Fed. Cir. 1998)....... passim

OTHER AUTHORITIES

FED. R. CIV. P. 56(a)...................................................................................................12

**TABLE OF EXHIBITS**

Ex. A – Statement of Undisputed Material Facts – *unredacted version filed under seal*

Ex. A-1 – Bottom I Deposition Transcript (October 25, 2017) – *filed under seal*

Ex. A-2 – George.COM Engineering Reference Specification (Exhibit 2 to Bottom I Deposition)

Ex. A-3 – Bottom II Deposition Transcript (May 6, 2019)

Ex. A-4 – Dr. Michalson Deposition Transcript (June 20, 2019) – *filed under seal*

Ex. A-5 – Forbes I Deposition Transcript (October 24, 2017) – *filed under seal*

Ex. A-6 – Forbes II Deposition Transcript (December 11, 2017) – *filed under seal*

Ex. A-7 – Release Notes for Version 1.03 of Ketris Manager (Exhibit 74 to Forbes III Deposition)

Ex. A-8 – Ketris Network Demo Doc. (Exhibit 11 to Bottom I Deposition)

Ex. A-9 – Forbes III Deposition Transcript (May 7, 2019)

Ex. A-10 – Exhibit 4 to Rousset I Deposition (hippster.com web page)

Ex. A-11 – Rousset I Deposition Transcript (July 18, 2018) – *filed under seal*

Ex. A-12 – Forbes ███████████ (executed) (Exhibit 60 to Forbes II Deposition) – *filed under seal*

Ex. A-13 – Bottom ███████████ (executed) (Exhibit 16 to Bottom I Deposition) – *filed under seal*

Ex. A-14 – Bottom ███████████. (Exhibit 14 to Bottom I Deposition) – *filed under seal*

Ex. A-15 – U.S. Patent No. 6,950,895 to Bottom (Exhibit 17 to Bottom I Deposition)

Ex. B – Putnam Report Regarding Validity of the '021 Patent– *filed under seal*

Ex. C – Dr. Michalson Expert Report on Validity

Ex. D – Exhibit 35 to Michalson's Expert Report on Validity – *filed under seal*

Acceleron moves for partial summary judgment of no invalidity of U.S. Patent No 6,948,021 ("the '021 Patent") on all § 102 and § 103 grounds involving "Ketris" because Dell improperly relies *only* upon uncorroborated oral testimony to allege that a Ketris system containing all the elements of the '021 Patent's claims was publicly displayed or operated before the '021 Patent's priority date. Acceleron also moves for partial summary judgment of no invalidity on the § 103 ground for "RLX" because Dell cannot corroborate that an "Orbiter prototype" was reduced to practice (with all elements of the '021 Patent) or publicly displayed (due to NDAs) before the '021 Patent's priority date. Thus, partial summary judgment of no invalidity is appropriate for all "Ketris" and "RLX" invalidity grounds, including those identified in Dell's expert, Dr. Michalson's Invalidity Report. *See* Ex. C at ii-iv.

1. **BACKGROUND**

    **1.1. The '021 Patent Solved a Big Problem in Computer Systems and Has a Priority date of November 16, 2000**

    The '021 Patent's priority date is Nov. 16, 2000 because it claims priority to U.S. Prov. App. No. 60/248,834 ("the '834 App.") filed on that date. *See* Ex. A, Statement of Undisputed Material Facts at ¶ 1; Doc. 168-1 ('021 Patent). The '021 Patent relates to a system "for enhancing fault tolerance and hot swapping in computer systems," such as file servers that may inconvenience many users when taken out of operation due to the required removal and replacement of components.

1

*Id.* at ¶ 2; '021 Patent at 1/15-16. The '021 Patent states that "[i]n systems that do not support hot swapping of components, each process of component insertion and/or removal requires a complete shutdown of the entire system to prevent damage to other components or to the system." Ex. A at ¶ 3 ['021 Patent at 1/31-37]. "In time critical systems such as communications systems, system downtime is both a financial problem as well as a service quality problem." *Id.*

The '021 Patent explains that "[a] drawback of hot swapping, however, is it requires trained personnel to insert and/or remove components from a computer system to minimize damage" to components of the system. *Id.* at ¶ 4 ['021 Patent at 1/39-41]. "Another drawback is electrical noise … caused by the change in current at the instance when connection is made between power pins of a component and corresponding elements of the computer system," which "may cause loss of data, incorrect program execution and damage to delicate hardware components," thereby affecting performance of the computer system. *Id*. ['021 Patent at 1/44-52].

As such, the '021 Patent "is directed to a hot swapping computer network appliance operating in mission critical applications where any computer downtime can result in serious consequences." *Id.* at ¶ 5 ['021 Patent at 1/60-67]. All eight asserted claims of the '021 Patent (3, 14-17, 20, 22, & 24) claim a computer network appliance comprising "a hot-swappable ethernet switch module." *Id.* at ¶ 6.

2

**1.2. Dell Cannot Show by Clear and Convincing Evidence That the Ketris 9000 Shown at a May 2000 Trade Show had a "hot-swappable ethernet switch module"**

*1.2.1. As Initially Developed by Ziatech, the Ketris 9000 Had No Ethernet Switch Module*

David Bottom joined Ziatech Corp. in early 1999 and began work on his idea for the ██████████████████████ Ex. A at ¶ 7; Ex. A-1, Bottom I Dep. Tr. 19/8-9; 24/22-25/1 & 24/10-12; 156/9. Mr. Bottom built ████████████████████ for his ████████████ but it lacked an Ethernet switch. Ex. A at ¶ 8; Ex. A-1 at 26/15-17.

In a May 13, 1999 reference specification for the Ketris project, codenamed "George.COM" at the time (*see* Ex. A-2), the design for what would become the Ketris 9000 called for ████████████████████████████████ ████████████████████████ Ex. A at ¶ 9; Ex. A-1 at 28/10-25. Mr. Bottom described this card as a ████████████████████████████ ████████████████████████████████████████ ████████████████████ *Id.*; Ex. A-1 at 29/20-22. While the George.COM reference spec. indicates that a "System Management Board" could possibly "provide an Ethernet hub/switch to tie all CPU's together via a dedicated Ethernet channel plus some additional management and alarm capabilities," it makes clear that a System Management Board "*has not been specified yet*" and that the pros and cons for several communication approaches were still being considered as design

3

options on the drawing board, including a repeater, a hub, a managed switch, and an

unmanaged switch.  Ex. A at ¶ 10; Ex. A-2 at 1 (emphasis added).

Mr. Bottom testified that ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ Ex. A at ¶ 11; Ex. A-1 at 30/7-12 & 33/1-11. Mr. Bottom said ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ Ex.  A  at  ¶ 12;  Ex.  A-1  at  29/24--30/2.  Learning  that ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████ Ex. A at ¶ 13; Ex. A-1 at 29/25--30/2 & 33/6-7.

According to Mr. Bottom, ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████ Ex. A at ¶ 14; Ex. A-1 at

120/7-24. As per Mr. Bottom, Ziatech decided ████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████. Ex. A at ¶ 15; Ex. A-1 at 54/3-9 &

4

35/15-19. Finally, after a number of iterations of flawed chips, Mr. Bottom explained that Ziatech received a "handful of Ethernet chips for the switch literally days before the [May 9-11, 2000 Networld Interop] show." Ex. A at ¶ 16; Ex. A-3, Bottom II Dep. Tr. at 325/23-25. As a result, Mr. Bottom claimed that ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████ Ex. A at ¶ 17; Ex. A-1 at 35/10-14 & 40/17-18.

However, just like the prior iterations, the chips received just days before the May 9-11, 2000, N+I show also had flaws, which caused "an error on the board layout" because the chip maker "reversed the polarities on a *whole group* of pins." Ex. A at ¶ 18; Ex A-3 at 357/10-11 & 20. (emphasis added). Because there was no time to wait for a corrected iteration of the chip to be made before the N+I show, Mr. Bottom testified that "they just cut the traces and reversed all the leads" themselves. Ex. A at ¶ 19; Ex. A-3 at 357/23-24. Mr. Bottom explained that the reversal of "*all* the leads" "was done with wires when we demonstrated" at the May 9-11, 2000, N+I show because of the cuts to the board to disconnect the copper traces in the silicon. Ex. A at ¶ 19; Ex. A-3 at 357/11-12 & 23-24 (emphasis added).

Dell's expert, Dr. Michalson, described the process for cutting and rewiring a circuit board to repair errors like this as ████████████████████████ Ex.

A-4, Michalson Dep. Tr. at 165/21-23. He also testified that ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████ " *Id.* at 166/8-12 &14-15.

### 1.2.2. The Only Evidence that a Board Was Modified to Provide an Operable Ethernet Switch for the Ketris 9000 Shown at the N+I Trade Show is the Inventor's Uncorroborated Testimony

#### 1.2.2.1. No Modified Ethernet Switch Boards Still Exist Today

There is no evidence that the cut and rewired Ethernet switches modified just

days before the N+I show still exist today. Ex. A at ¶ 20; Ex. A-4 at 166/24--167/4.

Indeed, when asked, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ Ex. A at ¶ 20; Ex. A-4 at 145/23--146/9. Because the

Ethernet modified switches do not still exist, neither Dell nor Acceleron can test their

functionality to determine if they were actually hot-swappable.

#### 1.2.2.2. No Contemporaneous Corroborating Documents Exist Depicting or Describing the Modified Ethernet Switches

Likewise, there are no documents, including drawings, schematics,

photographs, etc., in evidence that describe or depict the ████████████████ " and

████████ modifications to the Ethernet switches made only days before the N+I show. Specifically, when Dr. Michalson was asked if as part of his analysis and evaluation of the Ketris 9000 system whether ████████████████████ ████████████████ the Ethernet switches, as Mr. Bottom described in his testimony, Dr. Michalson answered, ████████████████████████ ████████ Ex. A at ¶ 21; Ex. A-4 at 169/11-14.

### 1.2.2.3. The Actual Ketris 9000 Unit(s) Allegedly Shown at the N+I Show Are Not Known to Still Exist Today

When former Ziatech employee, Bryn Forbes, was asked ██████████ ████████████████" marked as Exhibit 1 in his deposition (hereinafter "Forbes Depo. Ex. 1"), which is the *only* Ketris 9000 unit in evidence, Mr. Forbes testified, ████████████████████" Ex. A at ¶ 22; Ex. A-5, Forbes I Dep. Tr. at 17/3-10. When asked if ████████████████████████████ ████████████████████████████ ███ Ex. A at ¶ 23; Ex. A-6, Forbes II Dep. Tr. at 249/20--250/1. Dell's expert, Dr. Michalson, summarized it best, acknowledging that ██████████████████ ████████████████████████

████████████████████████
████████████████████████
████████████████
████████████████████

7

███████████████████████████████████████
████████████████████

Ex. A at ¶ 24; Ex. A-4 at 145/5-12.

Plus, the ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███. *See* Ex. A at ¶¶ 25-26; *See* Ex. A-6 at 225/25--226/2; Ex. A-7, Dec. 22, 2000

Release Notes for Version 1.03 of Ketris Manager at 1. Similarly, ████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████ *See* Ex. A at ¶¶ 27-28; Ex. A-5 at 72/6-9; Ex. A-7. Thus, the Ketris

9000 marked as Forbes Depo. Ex. 1 is not *the* configured unit from the N+I show.

### 1.3. No Clear and Convincing Evidence that the Ketris 9000 Unit Shown at the N+I Show or Demonstrated Thereafter in 2000 Had Software Configured to Poll the Late-Developed Ethernet Switch

Because Ziatech kept receiving flawed Ethernet switch chips from its vendor,

even right up to just days before the May 9-11, 2000, N+I show, Ziatech delayed

implementing certain features for the Ketris 9000 under development. Specifically,

in answering a question about polling the Ethernet switch and whether he

██████████████████████████████████████████████

Ex. A-8 at BOTTOM-02602

███████████████████████ ███████

███████████████████████████████ Mr.

Bottom testified, ████████████

███████████████████████

███████████████████████

███████████████████ *See* Ex. A at ¶ 29; Ex. A-1 at 245/7-14.

Mr. Bottom explained, █████████████████████████

████████████████████████████████████████████

████████████████████ Ex. A at ¶ 30; Ex. A-1 at 212/4-

10 & 19-20; Ex. A-8, Exhibit 11 to Bottom I Dep. at BOTTOM-02602. In describing

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ Ex. A at ¶ 30; Ex. A-1 at 212/8-10 &

219/13--220/4; Ex. A-8 (annotated above).

Regarding the functions Mr. Bottom described as the ████████████████

█████████████████ Mr. Forbes testified that the Ketris Manager software

running on the Ketris 9000 at the time of the N+I show was actually only a "beta

version" of the software "called 0.9." Ex. A at ¶ 31; Ex. A-9, Forbes III Dep. Tr. at

410/8-9 & 411/5. Mr. Forbes indicated that a final release Version 1.0 was available

9

"towards the end of the summer of 2000," but no documents confirm if polling the

Switch Manager was later implemented. Ex. A at ¶ 32; Ex. A-9 at 411/12-13. Indeed,

Version 1.03 Ketris Management Software Release Notes, dated Dec. 22, 2000, lists

a communication problem between the Ketris Manager software and the Ethernet

Switch Blade as one of the "Known Issues in this Release," raising further

uncertainty about polling even as of Dec. 2000. Ex. A at ¶ 33; Ex. A-7 at Forbes-

05748.

### 1.4. Dell Cannot Show by Clear and Convincing Evidence That Any Ketris 9000 Shown to Potential Customers Between May and August 2000 was Not Subject to a Non-Disclosure Agreement

Mr. Forbes testified that after the N+I show concluded, ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. A at ¶ 34; Ex. A-5 at

30/8-12. When asked if he himself ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ Ex. A at ¶ 35; Ex. A-5 at 31/20 – 32/9 (emphasis added). After admitting

that ▮▮▮▮▮▮ Mr. Forbes further acknowledged, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ *Id.*

### 1.5. No Corroborating Evidence Establishes RLX's Orbiter Prototype Was Ever Reduced to Practice, Publicly Shown, or Offered for Sale

In March 2000, Rocketlogix, Inc. formed and began developing web servers. *See* Ex. A at ¶ 37; *see also* Ex. A-10, Exhibit 4 to Rousset I Dep. at 1. Former Rocketlogix and current Dell employee, Stephen Rousset, testified that ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Ex. A at ¶¶ 38-39; Ex. A-11, Rousset I Dep. Tr. at 35/6; 81/8-9; & 85/3-4. However, as per Mr. Rousset, ████████████████████████████████. Ex. A at ¶ 40; Ex. A-11 at 86/16-20.

According to Mr. Rousset, ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. A at ¶ 41; Ex. A-11 at 79/1-13 & 80/3-9 & 80/13-15. Mr. Rousset testified that ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████. A at ¶¶ 42-43; Ex. A-11 at 78/16-19 & 80/24 – 81/2. Mr. Rousset also testified that ████████████ ████████████████████████████████████████████████████████████ Ex. A at ¶ 44; Ex. A-11 at 35/24 – 36/4; 36/9-11.

In January 2001, Roctketlogix changed its name to RLX Technologies, installed new executive leadership, and relocated from Plano, TX to a Houston

suburb. Ex. A at ¶ 45; Ex. A-10 at 1. Months later, ███████████████

███████████████████████████. Ex. A at ¶ 46; Ex. A-11 at

36/5-8; *see also* Ex. A-10 at 2. The RLX 324 product was characterized by Mr.

Rousset as ████████████████████████████████████████

████████████████████████████████████████████

█████████████ Ex. A at ¶¶ 40, 47 & 48; Ex. A-11 at 37/17-22 & 86/16-20.

## 2.   APPLICABLE LEGAL STANDARDS

### 2.1.   Summary Judgment of No Invalidity

Summary judgment is appropriate when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV.

P. 56(a). The movant has the burden of proving the absence of a genuine dispute of

material fact. *Celotex. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-movant has

the burden at trial, the movant may meet its burden by "point[ing] to materials on

file that demonstrate that the party bearing the burden of proof at trial will not be

able to meet that burden." *Clark v. Coats*, 929 F.2d 604, 608 (11th Cir. 1991).

Because patents are presumed valid, a party challenging validity has the

burden of proving its case by clear and convincing evidence. *Microsoft Corp. v. i4i*

*Ltd. P'ship*, 564 U.S. 91, 95 (2011). Thus, "a moving party seeking to have a patent

held not invalid at summary judgment must show that the nonmoving party, who

12

bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent." *Eli Lilly & Co. v. Barr Labs.,* 251 F.3d 955, 962 (Fed. Cir. 2001).

### 2.2.   Prior Art and the Requirement for Corroboration

"It is well established in our case law that a party claiming his own prior inventorship must proffer evidence corroborating his testimony." *Sandt Tech. v. Resco Metal*, 264 F.3d 1344, 1350 (Fed. Cir. 2001) (citing *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993)); *see also P&G v. Teva Pharm.*, 566 F.3d 989, 999 (Fed. Cir. 2009) (quoting *Hahn v. Wong*, 892 F.2d 1028, 1032 (Fed. Cir. 1989) (The inventor "must provide independent corroborating evidence in addition to his own statements and documents.")). Federal Circuit "case law is unequivocal that an inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof." *Martek Biosciences v. Nutrinova, Inc.,* 579 F.3d 1363, 1374 (Fed. Cir. 2009) (quoting *Price,* 988 F.2d at 1194); *see also Finnigan Corp. v. United States ITC,* 180 F.3d 1354, 1368 (Fed. Cir. 1999) ("[T]estimony concerning a witness's *own* anticipatory activities must be corroborated.") (emphasis in original).

"While [the Federal Circuit] has in the past applied the requirement of corroboration more often in the context of priority disputes under 35 U.S.C.

§ 102(g), corroboration has been required to prove invalidity under other subsections of § 102 as well." *Finnigan,* 180 F.3d at 1367 n.10; *Woodland Trust v. Flowertree Nursery*, 148 F.3d 1368, 1373 (Fed. Cir. 1998) (stating in a case involving § 102(a) prior knowledge and use, "[c]orroboration of oral evidence of prior invention is the general rule in patent disputes."). Indeed, the Federal Circuit has found that "[n]o principled reason appears for applying a different rule when other subsections of § 102 are implicated: a witness's uncorroborated testimony is equally suspect as clear and convincing evidence if he testifies concerning the use of the invention in public before invention by the patentee (§ 102(a)), use of the invention in public one year before the patentee filed his invention (§ 102(b)), or invention before the patentee (§ 102(g))." *Finnigan,* 180 F.3d at 1367.

3.   **ARGUMENT REGARDING "KETRIS"**

   3.1.   **Dell Cannot Establish by Clear and Convincing Evidence that the Ketris 9000 is Prior Art to the '021 Patent as a Matter of Law**

Dell asserts that the physical Ketris 9000 system is prior art to the '021 Patent under 35 U.S.C. §§ 102(a), 102(b), and 102(g)(2) for two reasons. *See* Doc. 208-1, Dell's Second Amended Invalidity Contentions at 10-11. First, Dell alleges that the Ketris 9000 system "was publicly displayed, publicly operated, and offered for sale at the May 9-11, 2000 [N+I show] by at least David Bottom." Doc. 208-6, Ketris Invalidity Chart at 2. Second, Dell alleges that the Ketris 9000 system "was publicly

14

displayed, publicly operated, and offered for sale … during multiple Ziatech sales trips during May through August of 2000 by at least Bryn Forbes." *Id.*

### 3.1.1. *Dell's § 102(b) Contention Fails Because the N+I Show Was Less Than One Year Before the '021 Patent's Priority Date*

"Section 102(b) prevents a person from receiving a patent if, 'more than one year prior to the date of the application for patent in the United States,' 'the invention was . . . on sale' in the United States." *Quest Integrity USA v. Cokebusters,* 924 F.3d 1220, 1227 (Fed. Cir. 2019). Since the '021 Patent claims priority to the '834 App., filed Nov. 16, 2000 (Ex. A at ¶ 1), the May 2000, N+I show is not prior art to the '021 Patent under § 102(b), even if, *arguendo*, the Ketris 9000 was offered for sale.

### 3.1.2. *Uncorroborated Oral Testimony on the Modified Ethernet Switches Disqualifies the Ketris 9000 as § 102(a) or (g)(2) Prior Art for Lack of a "Hot-Swappable Ethernet Switch Module"*

### 3.1.2.1. *The Actual Modified Ethernet Switches Do Not Exist*

Per David Bottom's oral testimony, the *only* Ethernet switches used at the N+I show were those modified just days earlier with cut traces and all the leads reversed on both on-board chips by the addition of wires due to flaws and errors discovered in the chips received days before the show. Ex. A at ¶¶ 17-19; *see supra* § 1.2.1. If those modified Ethernet switches still existed, then the parties could at least attempt to verify whether they are (or were) hot-swappable, as required by the '021 Patent.

However, since the modified Ethernet switches do not still exist today, as

confirmed by Dr. Michalson, the parties are unable to perform any tests to determine if the switches are or were hot-swappable.[1] *See* Ex. A at ¶ 20 (quoting Ex. A-4, Michalson Dep. Tr. at 167/3-4: ███████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████ ”). Thus, Mr. Bottom's testimony cannot be corroborated by the modified Ethernet switches, since they do not exist.

### 3.1.2.2. No Corroborating Documents Describing or Depicting the Actual Modified Ethernet Switches Exist

No corroborating documents exist in evidence depicting or describing the modifications made to the Ethernet switches before the N+I show or any time thereafter. Specifically, no documents, as Dr. Michalson also confirmed, describe, identify or specify which copper traces on the Ethernet switch boards were actually cut by Ziatech's technician(s) over 19 years ago and where on the boards wires were

---

[1]Acceleron's technical expert, William Putnam, questioned this issue in stating that "[g]iven that the versions of the Switch Blades allegedly demonstrated at the conference had traces cut and wires added to correct a PCB layout error where the polarity of groups of pins were reversed, it is not clear whether the Switch Blades were capable of being hot swapped." Ex. B, Putnam Validity Report at 46. Mr. Putnam further explained that, "[a]s described in the '021 Patent, one of the techniques for enabling hot swappability involved having connector pins of varying lengths"; therefore, "[r]eversing the polarity of at least these connector pins could render an otherwise hot-swappable component unable to be hot-swapped." *Id.*

actually physically added. *See* Ex. A at ¶ 21 (quoting Ex. A-4 at 169/11-14: ███████

███████████████████████████). Since such documents do not

exist, the parties cannot determine if the modified Ethernet switches would have

been hot-swappable based on any documented descriptions, schematics, drawings,

etc., to potentially corroborate Mr. Bottom's oral testimony.

This absence of any documentation describing any short or long-term

modifications made just before the N+I show or afterwards is noteworthy, since one

would expect there to be a schematic, drawing, or other document describing the

███████████████████████modifications, especially since the modifications

had to be replicated on each of the Ethernet switch boards for each of the "handful

of Ethernet chips for the switch [received] literally days before the [N+I] show." Ex.

A-3, Bottom II Dep. Tr. at 325/23-25; *see also Woodland Trust,* 148 F.3d at 1373

("It is rare indeed that some physical record (*e.g.,* a written document such as notes,

letters, invoices, notebooks, or a sketch or drawing or photograph showing the

device, a model, or some other contemporaneous record) does not exist.").

### 3.1.2.3. No Witnesses Corroborate Mr. Bottom's Oral Testimony

The only other former Ziatech employee deposed in this case is Bryn Forbes,

but he *repeatedly* testified that he did not even attend the N+I show. *See* Ex. A at

¶ 36 (quoting Ex. A-5 at 29/10: ███████████████████ Ex. A-6

17

at 250/4-5: ███████████████████████████ & Ex. A-9 at 453/9-

14: "Q. And I understand that you had indicated that you did not attend the [Networld

Interop] show, right? A. Correct."). Thus, when asked whether the Ketris 9000 unit

that is Forbes Depo. Ex. 1 is *the* unit "shown at the Networld Interop show in May

of 2000," Mr. Forbes responded that "I███████████████████████████

███████████████████████████ Ex. A-6 at 252/24 – 253/6 (emphasis

added). And when asked, "You didn't personally see what was demonstrated at the

Networld Interop show, did you?" Mr. Forbes responded, "I did not." Ex. A at ¶ 36

(quoting Ex. A-9 at 407/12-15).

Since Mr. Forbes did not attend the N+I show, he cannot corroborate Mr.

Bottom's testimony about the modified Ethernet switches, including whether or not

they were hot-swappable. Thus, there is no oral testimony corroborating the

existence of, let alone the actual modifications purportedly made to, the modified

Ethernet switches at any time, including at the N+I show or thereafter.

Even if Dell were to cite to oral testimony from Mr. Forbes as somehow

corroborating Mr. Bottom's oral testimony about the modified Ethernet switches, it

would still fail the "rule of reason" analysis to the "corroboration requirement." *See*

*Woodland Trust*, 148 F.3d at 1371 (reciting the eight criteria compiled in *In re*

*Reuter,* 670 F.2d 1015, 1021 n.9 (CCPA 1981)). For one, Mr. Forbes is not an

uninterested fact witness, but is instead a ███████████████████

███████ *See* Ex. A at ¶ 49 (Ex. A-12, ███████████████████████

███████).[2] As ███████████████ Mr. Forbes made several trips by private plane from

Southern California to Baker Botts' Palo Alto offices to help Dell's counsel and Dr.

Michalson prepare Dell's invalidity case based on the Ketris 9000. *See* Ex. A at

¶¶ 50-52; Ex. A-9 at 336/10--380/3; 338/2-5; 342/20-22; 343/20--345/1; 348/8-12;

353/14-18; 355/15-18; 365/10--366/24; 371/2-5; 374/8-14; & 374/17--375/13.

Also, the events at issue in Mr. Bottom's and Mr. Forbes's testimony occurred

19 years ago, thus failing the "time period" criteria. This long delay "reinforces the

heavy burden when establishing prior public knowledge and use based on long-past

events." *Woodland Trust*, 148 F.3d at 1373. Indeed, the Federal Circuit in *Woodland*

*Trust* noted that the Supreme Court in *Barbed Wire Patent Case* rejected the oral

testimony of 24 witnesses who testified that they had seen the same patented barbed

wire fence 16 years earlier at a county fair as being unreliable testimony of

"unsatisfactory character" due to "the forgetfulness of witnesses, their liability to

mistakes, their proneness to recollect things as a party calling them would have them

---

[2] Mr. Bottom is also a ██████████████████████████ on ██████ behalf. *See*
Ex. A-13, ████████████████. In an ██████████████████████████████
█████████████████████████████████████████████████████████ has
*nothing* to do with the facts leading to the development of the Ketris 9000. *See* Ex.
A at ¶¶ 53-54; Ex. A-1 at 231/15-22; 232/4-6 & 14-23; Ex. A-14, ████████████.

recollect them...." *Woodland Trust*, 148 F.3d at 1372 (quoting *Barbed Wire Patent Case*, 143 U.S. 275 (1892)).

> ### 3.1.2.4. Mr. Bottom's Uncorroborated Oral Testimony Alone is Insufficient to Constitute Clear and Convincing Evidence to Support § 102(a) or § 102(g) and, Thus § 103

"Corroboration of oral evidence of prior invention is the general rule in patent disputes." *Woodland Trust*, 148 F.3d at 1372. But here, the *only* evidence about the modifications made over 19 years ago to the defective Ethernet switches is from Mr. Bottom's oral testimony. Thus, Mr. Bottom's uncorroborated oral testimony alone does not establish by clear and convincing evidence that the modified Ethernet switches allegedly used at the N+I show were hot-swappable" to, thus, constitute a "hot-swappable ethernet switch module" *See Sandt Tech.,* 264 F.3d at 1350 ("It is well established in our case law that a party claiming his own prior inventorship must proffer evidence corroborating his testimony."). As such, the Ketris 9000 allegedly shown at the N+I show is not eligible prior art to the '021 Patent under the prior public knowledge or use provision of § 102(a) or the prior invention provision of § 102(g)(2), which thereby negates its eligibility as prior art under § 103.

Notwithstanding the issue regarding NDAs, as discussed below in § 3.1.4., the absence of evidence corroborating Mr. Bottom's oral testimony also supports the conclusion that Dell cannot establish by clear and convincing evidence that the

Ketris 9000 allegedly demonstrated by Bryn Forbes to customers between May and August 2000 had a "hot-swappable ethernet switch module," as required in each claim of the '021 Patent. Consequently, this missing required claim element eliminates the Ketris 9000 from being prior art under § 102(a), § 102(g)(2), and, thus, § 103 based on Mr. Forbes's summer 2000 customer visits.

### 3.1.3. Because There is No Clear and Convincing Evidence that Polling the Ethernet Switch was Ever Added Before 2001, Ketris 9000 is Not Prior Art to Claims 20 and 22 of the '021 Patent

In addition to the "hot-swappable ethernet switch module" required by all asserted claims, Dell cannot establish by clear and convincing evidence that the Ketris 9000 demonstrated at the N+I show or at anytime thereafter during any of Mr. Forbes's customer visits between May and August 2000 included a microcontroller module configured to "remotely poll … the ethernet switch module," which is an additional element of asserted claims 20 and 22 of the '021 Patent. Thus, the Ketris 9000 cannot as a matter of law constitute prior art to any invalidity ground asserted by Dell against claims 20 and 22.

As explained above, the only Ethernet switches used at the N+I show were the modified Ethernet switches. *See supra* § 1.2.1. Thus, it follows that Ziatech was not able to implement any configuration in the Ketris Active Manager software running on the server blades that would poll the modified Ethernet switch created



Ex. A-4 at 165/21-23 & 166/14-15. As a result, when questioned whether or not he ██████████████████ Mr. Bottom responded: ██████████████ Ex. A at ¶ 29; Ex. A-1 at 245/7-14.

It appears that Ziatech knew well before the N+I show that it would not have an Ethernet switch ready in time because it delayed developing a feature in the Ketris Active Manager software running on the server blades to poll the Ethernet switch, calling it "Feature to be released" in the future, as discussed above. *See supra* § 1.3. Thus, Dell cannot establish by clear and convincing evidence that the Ketris 9000 is prior art to claims 20 and 22 of the '021 Patent for purposes of anticipation under § 102, or obviousness in combination with another prior art reference under § 103.

> ### 3.1.4. *Evidence of NDAs Precludes any Ketris 9000 Unit Allegedly Shown by Mr. Forbes During the Summer 2000 From Constituting Prior Art Under § 102 or § 103*

"[T]o invalidate a patent based on prior knowledge or use [under § 102(a)], that knowledge or use must have been available to the public." *Woodland Trust*, 148 F.3d at 1370. Yet, "[c]ases in which courts find that a prior use was not a 'public

22

use' within the meaning of 35 U.S.C. § 102 have found active concealment of the method or system by the prior user, typically by contractual agreements to maintain secrecy." *AdvanceMe v. RapidPay*, 509 F. Supp. 2d 593, 609 (E.D. Tex. 2007).

With respect to Dell's allegations that the Ketris 9000 system was publicly displayed, publicly operated, and offered for sale by Bryn Forbes on customer visits between May and August of 2000, Mr. Forbes initially testified that ████████ ████████████████████████████████████████████████████████ ████████████ Ex. A at ¶¶ 34-35 (quoting Ex. A-5 at 31/20-24). Mr. Forbes later clarified, however, that ████████████████████████████████. *See id.* ¶ 35 (Ex. A-5 at 32/8-9: ████████████████████████████████ ████████████.""). These undisputed facts are more than sufficient to defeat any notion that Dell can establish by clear and convincing evidence that Mr. Forbes's customer visits somehow otherwise constituted *public* use prior art under § 102(a), which also negates application as prior art under § 103.

4. **ARGUMENT REGARDING "RLX"**

   4.1. **Dell Cannot as a Matter of Law Establish by Clear and Convincing Evidence that the Orbiter Prototype or any device under its "RLX" Label is Prior Art to the '021 Patent under §§ 102(a), (b), or (g)**

The crux of Dell's "RLX"-based arguments, according to Dr. Michalson's report, revolves around the Orbiter prototype and whether it was reduced to practice,

publicly known, or offered for sale before the '021 Patent's priority date. See Ex. C, Michalson's Invalidity Report at ¶¶ 120-124. However, as with the Ketris 9000, Dell relies only on uncorroborated oral testimony, this time from current Dell employee, Stephen Rousset, who was previously employed at Rocketlogix/RLX. *See supra* § 1.5. But Dell cites no evidence corroborating Mr. Rousset's oral testimony to tie the features of the Orbiter prototype to the claim limitations of the '021 Patent in an attempt to show reduction to practice. *See e.g.* Ex. C at ¶ 120 (incorporating the "RLX" claim chart attached as Exhibit 35); Ex. D, Exhibit 35 "RLX" claim chart.

Also, Mr. Rousset's testimony confirms there was no event that would qualify the Orbiter prototype as prior art under § 102(a), (b), or (g)[3] due to non-disclosure agreements. As discussed above, Mr. Rousset testified that ███████████████

████████████████████████████████████████████

██████████████████████████ *See* Ex. A at ¶¶ 41-43; *see supra* § 1.5.

Therefore, in addition to the lack of corroborating evidence establishing that the Orbiter prototype reduced the invention of the '021 Patent to practice, Mr. Rousset's testimony about ████████████████████████████

---

[3] Dell cannot rely upon the filing date of the Hipp patent as a constructive reduction to practice as part of a § 102(g) argument because Dell relied on Hipp in the IPR and is therefore statutorily estopped from re-arguing Hipp in this action pursuant to 35 U.S.C. § 315(e).

that Dell cannot establish by clear and convincing evidence that the Orbiter prototype qualifies as prior art under § 102(a) based on any *public* knowledge or use; § 102(b) based on any *public* use or sale more than a year before the '021 Patent's priority date; or § 102(g) making of the invention of the '021 Patent before the '021 Patent's priority date." *See Sandt Tech.*, 264 F.3d at 1350 ("Section 102(g)(2) provides that a person is entitled to a patent unless 'before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or *concealed* it.'") (quoting 35 U.S.C. § 102(g)(2)) (emphasis added). This failure also infects the RLX 324 that was released in May 2001 for the same reasons. *See supra* § 1.5. As such, Dell cannot sustain its obviousness invalidity contention pursuant to 35 U.S.C. § 103 based on the Hipp patent in combination with "RLX" (whether the Orbiter prototype or the RLX 324 system), which is why partial summary judgment of no invalidity is appropriate in this instance.

## 5.   CONCLUSION

For all these reasons, partial summary judgement of no invalidity should be granted on all invalidity grounds of Dell asserting "Ketris" or "RLX" under 35 U.S.C. § 102 or § 103, including as identified in the invalidity report of Dr. Michalson in Ex. C on pages ii. to iv.

Respectfully submitted this 7th day of August, 2019.

/s/ N. Andrew Crain
N. Andrew Crain
Georgia Bar No. 193081
andrew.crain@thomashorstemeyer.com
Dan R. Gresham
Georgia Bar No. 310280
dan.gresham@thomashorstemeyer.com
Eric Maurer
Georgia Bar No. 478199
eric.maurer@thomashorstemeyer.com
Robert D. Gravois
Georgia Bar No. 600183
robert.gravois@thomashorstemeyer.com
**THOMAS | HORSTEMEYER, LLP**
3200 Windy Hill Rd SE
Suite 1600E
Atlanta, Georgia 30339
Telephone:  770.933.9500
Facsimile:  770.951.0933

*Attorneys for Plaintiff Acceleron, LLC*

## <u>LOCAL RULE 7.1D CERTIFICATION</u>

The undersigned hereby certifies that the foregoing was prepared in Times New Roman 14 point, which is one of the font and point selections approved by the Court under Local Rule 5.1B.

*/s/ N. Andrew Crain*
N. Andrew Crain
Georgia Bar No. 193081
*Attorney for Plaintiff Acceleron, LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ACCELERON, LLC,

                Plaintiff,

    v.

DELL, INC.,

      Defendant.

Civil Action File No.

1:12-CV-04123-TCB

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2018, the foregoing was filed using the Court's ECF system, which will automatically send electronic notice of such filing to all attorneys of record.

                            */s/ N. Andrew Crain*
                            N. Andrew Crain
                            Georgia Bar No. 193081
                            *Attorney for Plaintiff Acceleron, LLC*